Argued February 3, reversed with instructions March 18, petition
for amendment of opinion denied April 6, 1964

# GEORGIA-PACIFIC CORPORATION *v.*
# STATE TAX COMMISSION

### 390 P. 2d 337

*Richard Rink,* Assistant Attorney General, Salem, argued the cause for appellants and cross-respondents. With him on the briefs was Robert Y. Thornton, Attorney General, Salem.

*John B. Crowell, Jr.,* Portland, argued the cause and filed briefs for respondent and cross-appellant.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, O'CONNELL, GOODWIN, DENECKE and LUSK, Justices.

GOODWIN, J.

The Oregon State Tax Commission appeals from a decree in the circuit court which reversed commission orders VL 59-110 and VL 61-360 and remanded the consolidated cases to the commission for further proceedings to determine the value of the taxpayer's sawmill property for the tax years 1957-1958 and 1958-1959.

There is also a cross appeal by the taxpayer. The taxpayer says the trial court erred in not adopting the taxpayer's estimates as the value of the property.

The cases were jointly reviewed before the circuit court for Lincoln County prior to the activation of the Oregon Tax Court. Thus, they were reviewed on the record made before the tax commission, ORS 306.555 (superseded), rather than tried *de novo* as is now provided by ORS 305.425. The primary issue in each case arises out of differences of opinion concerning the effect of functional obsolescence upon the value of a large lumber-manufacturing plant in Toledo, Oregon.

The plant was built in its present location in 1918. By 1923 it had been expanded to approximately its present size. Numerous changes were made in the intervening years. The record shows, however, that even though some new machinery had been installed the plant was, in 1957, substantially obsolete.

The taxpayer contends that for the year 1957-1958 the market value of the plant was no more than $1,603,000. The commission contends that the plant was worth at least $4,082,339. (Slightly higher figures are involved for the following tax year, but the basic issues, as well as the pertinent tax regulations,

remain the same for both years.) For *ad valorem* tax purposes, statutory "true cash value" is based upon market value as of the assessment date. ORS 308.205.

At the outset, both parties agree that there are insufficient sales of large sawmills to establish market value by reference to recent sales of comparable property.

Market value was defined in Oregon State Tax Commission Ad Valorem Property Tax Regulations 1956 (hereinafter referred to as Regs.), Art. 8205.1, as "the amount of money or money's worth for which property may be exchanged within a reasonable period of time under conditions in which both parties to the exchange are able, willing and reasonably well informed." In the absence of evidence of sales of comparable property, the same regulation further defined market value as that amount of money that would justly compensate the owner for the loss of the property. This guidance was later incorporated in ORS 308.205.

■ Since there are no sales of comparable property, some method of valuation other than that of comparing recent sales of sawmills must be employed. *Ore. Portland Cement Co. v. Tax Com.*, 230 Or 389, 369 P2d 765 (1962). The witnesses for both parties, with individual variations, used, or claimed to have used, the "replacement-cost-less-depreciation" method described in Regs., Art. 8205.1. In the replacement-cost-less-depreciation method of appraisal, obsolescence may be either functional or economic (or both). Regs. Art. 8205.1 B-1-b-(2).

For the purposes of the case at bar, the parties understood functional obsolescence to involve, *inter alia,* decrepitude of the plant, costs of maintenance related thereto, and the expense of carrying a sub-

stantial amount of overcapacity. The plant was designed to manufacture lumber from old-growth logs of a size and type now used primarily for plywood. Accordingly, the plant was described as "overbuilt", i.e., too big, and too heavily equipped, for the most economical utilization of the smaller logs being sawed for lumber in 1957. The taxpayer's witnesses developed comprehensive studies of payroll and other factors which they believed to be important in measuring the obsolescence of the plant. The witnesses called in support of the challenged assessment merely conceded that some obsolescence was present, but they did not say what effect obsolescence had on their opinion of market value.

The record shows that whatever value the taxpayer's plant has lies in its relationship to the taxpayer's timber holdings as a part of an integrated industrial complex. Without substantial reserves of saw timber in the same ownership, it was virtually conceded that the plant would have only salvage value. The taxpayer's witnesses testified, however, that during the tax years in question there was enough profit to be made from the taxpayer's timber to justify the continued operation of the sawmill. One witness said in effect that the company could not afford to shut down the plant long enough to replace it with a more modern plant, desirable though that might be, because the continued production of the existing plant was too valuable to suspend. This testimony makes it unnecessary to consider apparently contradictory testimony by other of the taxpayer's witnesses to the effect that the plant had salvage value only. *Georgia-Pacific Corp. v. State Tax Com.*, 228 Or 112, 120, 363 P2d 1105 (1961). The commission found no indication

that profitable operation would not continue into the indefinite future. The evidence supports the finding. Accordingly, the plant had substantial value to the taxpayer.

Since market value could not be determined by comparing sales of similar property, it became necessary to resort to a means of measuring value by analogy to "just compensation." Regs. Art 8205.1 A-2. In other words, the case was tried like a condemnation case involving the taking of unique property, but the motivations respecting value were reversed. The government sought a high value and the owner used every means possible to cry down the value. There was, of course, no impropriety in so doing.

The difficulties presented in this case arise from the attempts of the county's appraiser to reach what he considered to be the true cash value of the sawmill without taking account of the market value of the plant. The statutes require market value to be used as the standard. The county appraisal, without going into all its details, was based primarily upon 1948 replacement costs. These figures were apparently taken from former county appraisals. The 1948 replacement cost was then adjusted by allowance for accrued depreciation. The deputy who made the appraisal said that in estimating depreciation he took obsolescence into consideration in a general way, but he obviously did not attach to obsolescence the same significance the taxpayer did. He also testified that he was influenced by the knowledge that the property in question was the largest industrial plant in the county and that the county budget would be impaired by too low an appraisal. The "true cash" value finally reached by the assessor was $4,765,445.

The taxpayer, by the method outlined in ORS 309.100, challenged the assessor's figures. Thereafter, by reducing the value of all sawmills in the county by 25 per cent, the local board of equalization decreased the value of the taxpayer's plant equipment, which accounted for $2,732,425 of the assessor's figure, to $2,049,319. The board of equalization thereby arrived at a "true cash" value of $4,082,339. The board explained the 25 per cent reduction as an allowance for the depressed condition of the lumber market in 1957-1958. Market value was adjusted by the normal conditions factor as provided by ORS 308.205 and regulations made thereunder. The taxpayer appealed to the commission.

The commission reviewed the equalized assessment and took testimony. The commission found that the value as equalized was "representative of the full and actual market value of the subject property as of the January 1, 1957, date of assessment."

The commission considered the county assessor's figure (as equalized by the board) to be final unless overcome by convincing proof that the taxpayer was proposing a better figure. It took the view that the taxpayer had a two-fold burden: first to prove that the commission was wrong, then to prove that the taxpayer's proposed alternative was right.

The trial court was of the opinion that the county assessor's figures could not be supported by the record. The evidence sustained this finding. We are aware that the review of the assessor's work by the board of equalization ordinarily adds strength to the presumption of validity with which the assessor's work is clothed. *Southern Or. Co. v. Coos County*, 39 Or 185, 193, 64 P 646 (1901). The taxpayer ordinarily

must prove that both the assessor and the board of equalization were in error before the commission can overturn the estimates of market value found by the local authorities. *Case v. Chambers et al,* 210 Or 680, 707, 314 P2d 256 (1957). Here the action of the board of equalization adds nothing to the presumption of the validity of the assessor's estimates because it appears from the record that the board of equalization was not performing its statutory function of equalizing assessments. The board was simply granting tax-relief across the board to an industry that appeared to be in temporary distress. While it is not for us to comment upon the propriety of the board's action in this case, we should observe that such board decisions do not enhance the validity of the assessment. The county assessor's estimate must, therefore, stand or fall on its own merits.

Upon appeal to the courts, the taxpayer had the burden of proving that the commission also had erred, ORS 306.555, and that the error resulted in prejudice to a substantial right of the taxpayer. The trial court held that the commission was in error and that the error was prejudicial. We agree with the trial court.

The commission says now, however, that even if its assessment is shown to be inaccurate, the taxpayer cannot prevail because it failed to prove specifically what the true cash value of the property was for the years in question.

We do not believe such a result was the intent of the legislation which permitted the trial court to affirm, modify, or remand a commission order in a case of this kind. ORS 306.555. The statute provided that the taxpayer was to have relief if its substantial rights

had been prejudiced. Substantial rights clearly would be prejudiced if we were now to affirm an erroneous order of the commission simply because we did not agree completely with the taxpayer's own rather modest opinions concerning value.

The fact that the taxpayer may have placed upon its property for tax purposes a value it might not wish to adhere to in a condemnation case should not deprive the taxpayer of its proof that the county's appraiser had proceeded improperly. The assessor erred in failing, *inter alia,* to consider either fair market value or the factor of obsolescence.

A taxpayer, contesting an assessment that has been made by incorrect methods, is not bound to be absolutely correct in proposing an alternate figure. The penalty for being too conservative in one's own estimate of value should not be forced acceptance of the commission's figure. Once error in the assessment has been shown, the trial court may decide, if the record contains the necessary evidence, what the correct assessment should have been.

The taxpayer's witnesses had relied almost entirely upon the difference between the economic efficiency of the existing plant and that of a hypothetical ideal plant. Using this method of calculation, some of them arrived at minus values. (Capitalizing hypothetical savings that could be realized from the hypothetical plant "proved", in some cases, that the taxpayer was carrying a piece of property that was worth less than zero.) To avoid an apparently whimsical result, the taxpayer's witnesses arrived at a consensus that the plant was worth only scrap or salvage value. We have already noted that scrap or salvage value is unaccept-

able when a plant is operating at a profit. The plant in question had some additional value. Accordingly, the taxpayer was not entitled to have its version of market value adopted by the court.

■ The trial court held that further proceedings should be had at the administrative level in order to permit the commission to enter a proper assessment. This result was a permissible one. See *Case v. Chambers et al,* supra at 696. We do not believe, however, that such additional delay is necessary in this case. As will be seen, the record does permit the trial court to dispose of this case.

■ Each side contends that its evidence proves its theory of the case to be the correct one. Neither side wants the matter sent back to the commission for more evidence. After examining the substantial volume of evidence now in the record, we can understand the desirability of putting a halt to the taking of more evidence. It is unlikely that either side would enhance its case by more evidence. Since the matters in issue are so largely matters of opinion, it is doubted that the marshaling of still more opinions would shed light on the issue. The judge who tried the case is in as good a position as is the tax commission to put a market value on the property, and he is not a party to the litigation. The court should dispose of the matter.

■ The court may request counsel to submit any supplemental briefs and arguments that might be desirable in connection with the fact-finding that yet remains to be accomplished. The work still before the trial court is essentially that which would be presented to a jury in a condemnation case. The evidence of the experts is in the record. Counsel have addressed them-

selves to argument upon its meaning. If there remain questions to be asked of counsel, the trial court should ask them. Ultimately, the court must decide where, between the taxpayer's proposed value and the value given the property by the assessor, the fair market value thereof lies.

■ In so deciding, the court should give whatever effect it deems proper to the evidence of obsolescence. "Broadly speaking, depreciation is the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, inadequacy, and obsolescence * * *." *Lindheimer v. Illinois Tel. Co.,* 292 US 151, 167, 54 S Ct 658, 78 L Ed 1182 (1934).

■ While the taxpayer did support its theory of obsolescence with evidence concerning income earned by the taxpayer at the Toledo mill, and with evidence that still greater income could have been earned by a more efficient plant (the latter point being undenied), the taxpayer left other questions unanswered. Income, for example, can be misleading unless the true cost of raw materials is taken into account. The cost of raw material was not revealed. Intracompany billings for logs were offered in evidence, but their figures shed no light on the value of the plant. Such billings may or may not represent actual costs. Regarding partial disclosure of income, see *Ore. Portland Cement Co. v. Tax Com.,* 230 Or 389, supra.

■ The insured value of the property ($5,000,000) is a matter the trial court is free to consider. Property can, of course, be insured at replacement cost, or at some other value that may be more or less than market value. Evidence of insured value in a case of this

kind certainly is not binding upon either party. In light of testimony, however, that a new (hypothetical) plant would produce insurance savings annually in excess of $14,000, the cost of insurance for the plant in question appears to be substantial. Management, therefore, must have some good reason for carrying $5,000,000 worth of fire insurance if the plant is worth only $1,600,000. The trial court is entitled to inquire into the matter of insurance and to weigh the evidence thereon along with the other evidence relating to value.

In view of the trial court's finding that the assessment contended for by the commission was defectively made, and in view of the commission's position on appeal that the cause should not be remanded to the commission, the trial court should dispose of the case. Under ORS 306.555, the trial court may modify the commission order. Under the circumstances of this case, the trial court would appear to have the necessary authority to supplement the record in such particulars as it may consider proper in reaching a final decision concerning value.

Finally, the commission contends that this case was never properly before the circuit court (and, accordingly, is not properly before this court) because of an alleged jurisdictional defect in the initial appeal to the circuit court. The commission contends that the filing of a certified copy of the order of the board of equalization was not accomplished according to ORS 306.545 as it read during the times material to this appeal. Oregon Laws 1955, ch 264. The contention is without merit. The certified copies required by statute were certified by one of the taxpayer's attorneys instead of by the county clerk of Lincoln County. The documents were served as provided by the relevant

statutes and within the time allowed. The commission made a general appearance in response thereto. The statute does not say that the certificates have to be executed by a particular officer. There is no reason to believe that the legislature intended the certificate of a particular officer to be jurisdictional. If there was a procedural defect in not obtaining the certificate of the county clerk, it is the sort of defect that was waived when the commission appeared and proceeded without objection. Oregon Laws 1955, ch 264, § 2.

The taxpayer's cross appeal is disposed of by what we have said concerning the principal question on appeal. Since we agree with the trial court that the taxpayer was not entitled to have a decree entered solely in accordance with the opinions of its experts, it was not entitled to relief on its cross appeal.

Reversed with instructions to enter a final decree; neither party to have costs.