Argued September 11, modified December 16, 1970, petition for
rehearing denied March 3, 1971

REYNOLDS METALS COMPANY, *Respondent
and Cross-Appellant, v.* DEPARTMENT OF
REVENUE, *Appellant and Cross-Respondent.*

477 P2d 888
481 P2d 352

*Carl N. Byers,* Special Assistant Attorney General, Salem, argued the cause for appellant and cross-respondent. With him on the briefs were Lee Johnson, Attorney General, and Theodore W. de Looze, Assistant Attorney General, Salem.

*Allan Hart,* Portland, argued the cause for respondent and cross-appellant. With him on the briefs were Lindsay, Nahstoll, Hart, Duncan, Dafoe & Krause, Portland.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE, HOLMAN, TONGUE and MENGLER, Justices.

DENECKE, J.

This appeal presents this court with a task of extreme perplexity,—fixing the true cash value of the plaintiff's aluminum reduction plant at Troutdale, Oregon. The county assessor fixed the value for 1968-1969 ad valorem tax purposes at $18,000,000. The taxpayer contends its value is $9,924,432. The Tax Court found the value to be $12,358,717. 3 OTR 470 (1970). Both the taxpayer and the Department of Revenue appeal.

The function of the plant is to reduce a raw material, alumina, to aluminum by an electrolytic process. The plant now produces 100,000 tons of aluminum yearly. The facility was completed in 1942 and taken over by Reynolds in 1946.

Prior to the present appraisal, the last appraisal for property tax purposes was in 1961 when an independent appraisal company appraised it in the amount of $18,770,500 for the predecessor agency of the Department. The assessor placed a value on it at that time of $18,440,000. Subsequent to 1961,

the assessed values were reduced each year but apparently took into consideration any capital improvements made during any tax year. The assessed valuation for 1967 was $12,610,936.

ORS 308.234 requires a reappraisal at least every six years. In 1967 the office of the Multnomah County Assessor, with the assistance of the defendant Department of Revenue, reappraised the facility. The reappraisal was performed by a physical inspection of the buildings, machinery and equipment, securing information from the taxpayer, securing information from persons dealing or familiar with machinery and equipment of the type used by Reynolds, and a study of the literature on the subject.

Reynolds sought independent appraisals and engaged the services of two appraisal firms represented by Mr. Vaughan and Mr. Nichols who made appraisals in the same general manner as the assessor.[①] Mr. Vaughan determined the true cash value to be $9,858,000 and Mr. Nichols,—$10,280,000.

The Tax Court refused to accept the assessor's appraisal for reasons enunciated in its opinion and for reasons not enunciated, did not accept the appraisals of Messrs. Vaughan or Nichols. The Tax Court's only statement of its determination of true cash value was in its opinion, as follows:

"In determining the true cash value of the plant for 1967 the Multnomah County Department of Revenue reduced the prior year's valuation of $12,852,107 by approximately 2 percent. Applying this same percentage to the 1967 value of $12,610,936 results in valuation of $12,358,717, which

---

[①] Mr. Vaughan was instructed only to conduct a depreciation and obsolescence study.

the court finds to be the true cash value of the subject property as of January 1, 1968."

■ We hear appeals de novo from the Tax Court. ORS 305.445. We ordinarily give great weight to the Tax Court's findings. In this case, however, we are of the opinion that with three current appraisals, the preferable method of fixing value is making use of the best of these appraisals or portions thereof. When the legislature established a policy of requiring re-appraisal every six years, it recognized the deficiencies in attempting to determine value by applying factors to out-of-date appraisals. The record does contain the assessed values for each year after the appraisal of 1961. These show a downward trend, but there is no explanation in the record for the basis of the yearly valuations. A reduction of 2 per cent in valuation from 1966 to 1967 might have been too large or too small. We reluctantly conclude that we are obliged to go into the details of the three appraisals and on the basis of these appraisals make a determination of true cash value.

The first decision to be made by the appraisers was which of the three traditional approaches to valuation would be used. The market or sale approach could not be used because there were no comparable sales. The income approach also could not be used as the income from this plant was not available. This left the cost or summation approach as the only feasible method and this is what the assessor, the department and Reynolds agree is a correct basic approach.

The cost approach determines the value of improvements by estimating the reproduction or by estimating the replacement cost and subtracting the

estimated decrease in value due to depreciation and obsolescence.[2] The appraisers and the assessor were in agreement on a reproduction or a replacement cost of approximately $50,000,000. The testimony was that reproduction cost is the cost of duplicating the plant as it stands, whereas replacement cost is the cost of constructing a substitute, and if the technology has improved, the substitute will be modernized by incorporating the technological improvements.

The Department, before the Tax Court and in this court, argued that the assessor's $50,000,000 reproduction cost is too low, that replacement cost, not reproduction cost, is the correct starting point and replacement cost in this instance is $70,000,000. This figure was based upon the testimony of an employee of the Department who had done some investigation but had made no appraisal. The Tax Court rejected this contention and so do we.

The Department's estimate on replacement cost is largely based upon information stated in trade publications and some general statements made by officials of another reduction plant. These may be the best sources the Department could find to determine replacement cost; however, we find the assessor's detailed study to determine reproduction cost to be more convincing.

The Department argued in the alternative that reproduction cost should be at least $58,000,000. The Department made no detailed appraisal. Its figure on reproduction cost was obtained by "trending" the reproduction cost as reported in the 1961 appraisal.

---

[2] Obsolescence can be treated as a part of depreciation. In the instant case all treated it as separate.

"Trending" is performed by using cost trending factors and thereby transforming costs from a previous period into present costs. This calculation assumed the 1961 appraisal estimate of reproduction cost was correct and the assessor's 1967 cost erroneous. We find no evidence persuading us to make that inference. Accepting the Department's contention also would necessitate accepting a calculated figure over a detailed, on-the-spot appraisal and, again, we find nothing in the evidence persuading us to follow this course. We, therefore, accept a reproduction cost of $50,000,000 as a correct starting basis to determine value.

The assessor and the appraisers engaged by Reynolds were not agreed upon depreciation. All were using depreciation to encompass a decrease in value due to age and use. The assessor determined the depreciation to be $29,500,000. Mr. Nichols $24,500,000 and Mr. Vaughan $33,500,000. An examination of the detailed depreciation schedules of Vaughan and the assessor shows that they were not in serious disagreement upon any one item; there was simply a difference in many items, the total difference of which was $4,000,000. We cannot determine whether Mr. Vaughan or the assessor is correct in these determinations; for example, whether Vaughan's assessment of the depreciation in the pot lines,— $2,511,850, is more accurate than the assessor's assessment, $2,411,380. Nichols' estimate of depreciation was lower than the assessor's, which fact lends credence to the assessor's estimate. Reynolds has the burden of proof. ORS 305.427. Under the state of the evidence, we accept the assessor's estimate of depreciation of $29,500,000.

In addition to a decrease in value due to age and use of the property another factor decreases the value and this is at the heart of the entire controversy. This factor is the functional or technological obsolescence of the plant and equipment. Mr. Nichols' report states: "Due to technological advances as represented in the modern replacement plant previously described, functional obsolescence exists due to the excessive cost of continuing operation of the Troutdale plant as presently constituted." Stated another way, if the Troutdale plant were completely reproduced at a cost of $50,000,000, it would not have a value of $50,000,000 to a buyer because its operating costs would be higher per ton than new plants which have incorporated the new technological changes.[9]

All agree functional obsolescence has occurred and has decreased the value; however, the three evaluators substantially disagree upon the amount of the decrease. Nichols found a decrease of $15,220,000, Vaughan of $6,243,250 and the assessor of $2,115,000. All agree that the best measure of functional obsolescence is the excessive costs of operating the old plant. The appraisers engaged by Reynolds estimated substantially higher excess costs than did the assessor. The best method of determining how excessive the costs are would be by comparing the operating costs of the old plant and a new plant. Grant and Norton, Depreciation, ch 13, p 268 (1955); 1 Bonbright, Valu-

[9] Functional or technological obsolescence should be distinguished from economic obsolescence. "Economic obsolescence is the result of forces outside of the building itself * * *." Encyclopedia of Real Estate Appraising, Johnson, Cost Approach to Value, 37, 50 (1959). Georgia Pacific v. Tax Com., 237 Or 143, 390 P2d 337 (1964), considered the functional obsolescence of a lumber manufacturing plant. Ore. Portland Cement Co. v. Tax Com., 230 Or 389, 369 P2d 765 (1962), involved a claim of economic obsolescence.

ation of Property, examples in ch 10, p 177 (1937). Reynolds had such information but it refused to reveal it and apparently neither the Department nor the assessor sought to obtain this information by legal compulsion. The Troutdale plant manager based his refusal upon the advantage the statement of such costs would be to Reynolds' competitors. This is plausible; nevertheless, it places Reynolds at a disadvantage in sustaining its burden of proof on this aspect of the valuation.

Both appraisers estimated that the Troutdale plant had about $2,500,000 per year in excess labor costs. The assessor estimated $2,150,000. Excess labor cost was the only excess cost used by the assessor, whereas both the appraisers estimated additional yearly excess costs in the approximate amount of $2,200,000. Both appraisers computed total yearly excess costs to be in the amount of $4,700,000.

The difference in the procedures followed by the appraisers and the assessor in using these excess costs to determine true cash value is of particular significance.

Mr. Vaughan evaluated the effect of these excess costs from the point of view of a prospective purchaser who would be willing to purchase Troutdale at true cash value. He reasoned that a prospective purchaser would have to consider, in addition to the total excess operating costs of Troutdale, the reduced depreciation costs of an old plant as compared to a new, modern one. A new plant, estimated to cost $50,000,000, would have $2,500,000 additional depreciation a year than the present old plant. Or, stated differently, the value of a new plant would lessen in value $2,500,000 per year because of de-

preciation.[4] This annual depreciation would be a cost of operating a new plant and must be offset against the excess operating costs of Troutdale. For this reason Vaughan deducted the yearly "depreciation requirement" of a new plant, $2,500,000, from the excess costs that would be incurred if the Troutdale plant were purchased. The remainder, $2,200,000, is the yearly net excess costs the purchaser would have to pay if it should buy the Troutdale plant. Vaughan reduced this amount still further in order to allow for the effect of federal income tax on that money which would be saved by a modern plant that eliminated the net excess operating costs. Using the federal corporate rate of 50 per cent (federal taxes would take 50 per cent of the additional profits realized if the purchaser did not have $2,200,000 in excess costs) Vaughan concluded that the annual net reduction in profits after taxes due to functional obsolescence is only $1,100,000.[5]

This $1,100,000 represents a yearly loss of profits. To determine the total decrease in value of plant and equipment that this loss would occasion the appraiser has to first estimate the remaining life of the facilities, which he determined to be 10 years. Therefore, this yearly loss would be incurred annually for 10 years. He also estimated that if the sum represented by these lost profits had not been lost such sum would have yielded a 12 per cent annual return. He then reduced this 10-year loss to its present value. This was computed to be $6,243,250, which

---

[4] Depreciation must be considered as an expense or as a decrease in value of the asset and not as a desirable deduction from income for tax purposes.

[5] This overlooks the state corporate tax; however, with all appraisals using some very general estimates we do not believe it necessary to attain complete precision.

represented the decrease in value because of functional obsolescence.

Nichols followed the same procedure with two major exceptions. Nichols did not deduct from gross excess operating costs which would be incurred if one purchased the Troutdale plant the larger depreciation requirement which would be incurred if the would-be purchaser instead built a modern plant. No explanation was given for this omission. Nichols used an expected rate of return on investment of 9 per cent as compared to 12 per cent by Vaughan. This increased the present worth of the obsolescence deduction by $2,000,000. Because of these two differences, Nichols' obsolescence deduction was $15,220,000 rather than $6,243,250, as found by Vaughan.

The assessor's procedure in determining the decrease in value because of obsolescence substantially varied from the procedures used by either of the other appraisers. As stated, the assessor's estimate of annual excess costs was $2,150,000 as he only recognized excess labor as incurring excess costs. He then reduced this amount by 50 per cent to allow for the effect of federal income tax; this left a sum of $1,075,000. The assessor estimated the remaining life of the facility to be 23 years, as compared to 10 by the two appraisers, and the return on investment to be 8 per cent as compared to 9 per cent and 12 per cent by the two appraisers. On this basis he multiplied $1,075,000 by the present worth factor and arrived at a sum of $11,100,000.[©]

---

[©] The present worth of the decreased value computed by the assessor is substantially larger than that computed by Vaughan despite the excess costs estimated by the assessor were less than those estimated by Vaughan. This occurred because the assessor

The assessor did not, however, deduct the $11,000,000 as the decrease in value due to obsolescence. Instead, he deducted $9,000,000 from the $11,100,000, leaving $2,100,000, which latter figure was deducted for obsolescence. Neither the assessor's representative nor the Department witnesses were able to clearly express why this $9,000,000 was deducted from the capitalized decrease in value caused by obsolescence or how the $9,000,000 was determined. The Department made the $9,000,000 estimate but the Department witnesses were unable to be specific about its ingredients and one characterized the estimate: "It was strictly an estimate and it is probably a pretty broad one." The assessor's representative stated: "The $9,000,000 was an estimate of what it would cost to have better craneways, better handling of materials—."

The representative testified the reason for the $9,000,000 deduction was: "The $9,000,000 deduction represents the excess—the extra amount of money that would have had to have been spent in the original design and construction of this plant to realize these savings."

A supervisor from the Department testified:

"There's nothing to generate the $11,000,000 from. I can't take one old plant and compare another old plant to it and say $11,000,000 of excess operating costs. I have to take the replacement cost if I'm going to develop this difference. I will take the $11,000,000 of the replacement cost but I can't take it off reproduction cost. So we tried to

used a longer life expectancy for the facility and a lower rate of return on investment. The longer the life and the lower the rate of return, the more the present worth will be.

make this adjustment by saying that the amount of mechanization and other improvements necessary in this old plant to effect this savings would be $9,000,000."

Counsel for Reynolds referred to deducting the $9,000,000 as increasing the market value because of obsolescence, an obvious incongruity, and argued that this was the crux of the case. The Tax Court also was unable to follow the assessor's reason for deducting the $9,000,000.

We have had the benefit of refinement in counsel's thinking since the decision of the Tax Court. The briefs and oral argument reflect this refinement. With this advantage and from extensive study of the transcript and exhibits we are of the opinion that we have some comprehension of the reasoning the assessor used when he deducted $9,000,000 from $11,-000,000. We believe he was attempting to accomplish the same result that Vaughan was when he deducted $2,500,000 per year as the additional depreciation requirement of a modernized plant, from the Troutdale plant's excess operating costs. The assessor, the Department and Vaughan believed a prospective purchaser, when deciding whether to buy the old plant or build a modern one, would take into consideration that a new one would cost much more and this additional cost in some way would at least partially offset the savings of excess costs that would be obtained by building a modern plant. This belief appears reasonable.

■ We are of the opinion, however, that the calculations of Vaughan in computing the net decrease in value because of obsolescence are more acceptable than those of the assessor and Department. None of the Department witnesses were able to testify with

any certainty to the detailed makeup of the $9,000,-000 deducted. Vaughan in his report went into detail describing how he arrived at his estimate of $2,500,-000. While this figure was only an estimate, the witness nonetheless appeared to have followed standard factors and procedures. In addition, the assessor did not take into account the cost of modernization in making a reduction for federal income tax; rather, he only reduced the excess costs. Vaughan, on the other hand, did not take the tax consequences into account until he had offset excess costs by the cost of modernizing, that is, the deduction for increased depreciation. This procedure appears to us to be more realistic.

For these reasons we conclude that the decrease in value for obsolescence of $6,243,250 as determined by Vaughan is the most acceptable.

On this basis we compute the true cash value of the Troutdale facility to be:

| | | |
|---|---|---|
| Reproduction Cost | | $49,587,451.00 |
| Less depreciation | $29,500,000.00 | |
| Less obsolescence | 6,243,250.00 | |
| | $35,743,250.00 | 35,743,250.00 |
| True cash value | | $13,844,201.00 |

Modified.

ON PETITION FOR REHEARING

Carl N. Byers, Special Assistant Attorney General, Lee Johnson, Attorney General, and Theodore W. de Looze, Assistant Attorney General, Salem, for the petition.

Allan Hart and Lindsay, Nahstoll, Hart, Duncan, Dafoe & Krause, Portland, contra.

DENECKE, J.

The Department of Revenue filed a petition for rehearing contending, among other things, that Mr. Vaughan erred in his computations of the decrease in value due to functional obsolescence. One claimed error

was that "he used the *total* annual book depreciation [of a new technologically modern plant] as an offset against the annual excess operating costs [of the present plant]." (Emphasis added.) Only the *difference* in depreciation between the present plant and a new modern plant should be used as an offset against excess operating costs of the present plant. We interpreted Mr. Vaughan's testimony to the effect that he did use only the difference in depreciation of the two plants. If we were incorrect the error would not benefit the Department because it would further reduce the value of the present plant. The use of a smaller depreciation offset against excess operating costs would result in a greater decrease in value due to functional obsolescence.

Petition denied.