## OAK ACRES MOBILE HOMES PARK, INC. *v.*
## DEPARTMENT OF REVENUE

James E. Redman, Redman & Carskadon, Milwaukie, represented plaintiff.

Alfred B. Thomas, Assistant Attorney General, Salem, represented defendant.

Decision for plaintiff rendered March 12, 1971.

LOREN D. HICKS, Judge pro tempore.

The issue in this case is the true cash value on January 1, 1969, of plaintiff's mobile home park on Highway 212 just east of the town of Clackamas, Oregon. The Clackamas County Assessor fixed the value at $650,000. The Department of Revenue sustained the value set by the assessor. The plaintiff claims the value was $517,916. The dispute concerns the true cash value of the improvements, the parties being in agreement that the land was assessed correctly at $160,000.

Plaintiff's park, which was completed in 1962 with additions in 1967, contains 23.72 acres of land, is surrounded by a chain-link fence and has spaces for 237 mobile homes. It has paved streets, a beauty shop, a swimming pool, utilities (including a sewage disposal plant), a community hall and other improvements. It caters to family tenants which causes its per space population and operating costs to be greater than would be found in a park for adults only.

In making its appraisal, the county appraiser considered the income approach, but primarily relied on the market data approach using a gross rent multiplier and two comparable sales. Both parties agree that the replacement cost approach is not appropriate for this appraisal.

In considering the income approach, the county appraiser started with an estimate of a "warranted gross income" of $116,260, less a vacancy allowance of $8,138 and less estimated operating expenses of $34,500. He also subtracted $878 for taxes, interest and depreciation chargeable to personal property and

$15,200 for taxes and interest attributable to the land, leaving a net income for the improvements of $57,544 before interest, depreciation and taxes. He then capitalized this net income at a 12½ percent rate, made up of 7 percent interest, 3 percent depreciation and 2½ percent property taxes (the approximate tax rate in Clackamas County).① Under this income approach a valuation of $460,352 was reached for the improvements.

For the market data approach, the appraiser selected a multiplier of 5.6. He chose this factor after viewing the property, comparing the two recent sales, studying statistics on the operation and sales of mobile home parks in the area and considering the income approach. To the "warranted gross income" of $116,260 he applied the multiplier and obtained a true cash value of $651,056 which he rounded to $650,000. Allowing $160,000 for the land, he placed the value of the improvements at $490,000. The assessed value was set at this amount.

Plaintiff contends that the valuation is erroneous on the grounds that the county used an exaggerated gross rent multiplier, relied on comparables that were not really comparable and placed too much emphasis on the market data approach. Plaintiff argues that Oak Acres Mobile Homes Park is not a typical park and that therefore the market data approach is unreliable and that primary reliance should be placed on the income approach. Plaintiff also objects to the

① When the appraisal is for the purpose of imposition of a property tax, it is preferable to add the tax rate to the capitalization rate rather than to use amounts previously paid as property taxes. *New Brunswick v. State of New Jersey*, 39 NJ 537, 545, 189 A2d 702 (1963). Also see 1 J. Bonbright, *The Valuation of Property* 257-258 (1937).

Cite as 4 OTR 340

income and expense amounts and the capitalization rate used by the county appraiser in his computations in the income approach.

From the preponderance of the proof made at the trial, the court finds itself in agreement with the plaintiff that defendant's valuation is in error. It is too high. The purpose of an appraisal is to determine the true cash market value of the real estate. The market data approach is required in the assessment of property when a market and useable comparables exist.[2] *Portland Canning Co. v. Tax Com.*, 241 Or 109, 113, 404 P2d 236 (1965). However, use of other appraisal methods is often called for as an aid in evaluating the subject property and the comparables, and as a cross-check on the market data results or as the primary approach when evidence of a market and comparables is insufficient.[3]

---

[2] ORS 308.205:

"True cash value of all property, real and personal, means market value as of the assessment date. True cash value in all cases shall be determined by methods and procedures in accordance with rules and regulations promulgated by the Department of Revenue. With respect to property which has no immediate market value, its true cash value shall be the amount of money that would justly compensate the owner for loss of the property."

R308.205-(A) 1:

"1. Definitions:

"a. *Market Value* as a basis for true cash value shall be taken to mean the amount of money or money's worth for which property may be exchanged within a reasonable period of time under conditions where both parties to the exchange are able, willing and reasonably well-informed.

"b. *Immediate market value* of property exists when there are sales of comparable properties at times and places which are reasonably relevant under the existing circumstances."

[3] R308.205-(A) 2:

"2. Methods and Procedures for Determining True Cash Value:

"Real property shall be valued through the market data

■■ The market looks to income and therefore the income approach is always helpful and appropriate in an appraisal of income-producing property, especially, as in this case, when the property being appraised is a going enterprise rather than individual assets. Also, an analysis of income is required whenever a gross rent multiplier is to be used. Intelligent selection of the multiplier requires an analysis of income of the subject property in comparison with the income of comparables and the market generally.

In his computations the county appraiser estimated the gross income of plaintiff's park at 100 percent occupancy to be $116,260, which varied considerably from the actual gross earnings of $132,960. His estimate of $34,500 operating expense was even further from the actual amount which was $63,182. Defendant's appraiser admitted in his testimony that if he had known of the unusually high expenses he might have set a lower value on the property. The evidence showed that the net earning ratio of plaintiff's park, even though it is well managed, is considerably less than the average for mobile home parks in the area.

■ Considering the prevailing bank interest rates in 1968-69, and the fact that money invested in a mobile home park is comparatively nonliquid, requires considerable management and bears a degree of risk, the 7 percent interest rate used by the county appears to be too low. Furthermore, the depreciation rate of 3 percent (33 1/3 years) seems unrealistic.

approach, cost approach and income approach. Any one of the three approaches to value, or all of them, or a combination of approaches, may finally be used by the appraiser in making an estimate of market value, depending upon the circumstances."

In choosing a depreciation rate for a mobile home park, consideration must be given to physical wear from use and from passage of time; functional obsolescence from continuing improvements in design; and economic depreciation caused by the ever-changing attitudes of the public, changes in characteristics of the neighborhood and other factors affecting demand for a particular mobile home park. Thirty-three and a third years is too long a prediction for plaintiff's park. For purposes of depreciation for income tax accounting, the Internal Revenue Service has adopted 20 years as a guideline for the life of land improvements such as paved surfaces, sewers, fences, and landscaping.[*] On January 1, 1969, plaintiff's park was seven years old, and there was evidence that some of the homesite "pads" already were showing signs of breakdown.

In using the gross rent multiplier approach, the county appraiser relied to a great extent upon the practice in the trade of selling a trailer park by an amount equal to its gross income times a multiplier. There was evidence that the average gross rent multiplier for sales of mobile home parks in and around Clackamas County is 5.5. The two comparable sales used by the county appraiser indicated a gross rent multiplier of about 6.5. The plaintiff's expert witness on the other hand advocated a multiplier of only 4 for the plaintiff's property. However, plaintiff offered no evidence as a basis for using that particular multiplier. In fact, from the record it is not possible to determine what figure might properly be chosen as a multiplier. The evidence was meager as to whether the gross income figure used in connection with multi-

[*] Rev Proc 62-21, 1962-2 Cum Bull 419.

pliers for nearby parks was potential gross or actual gross, gross income of the entire operation or only gross rents as distinguished from miscellaneaus income sources, etc. Also there was little evidence as to whether the county appraiser considered individual differences between Oak Acres and other parks in selecting his multiplier of 5.6 for Oak Acres.

In a discussion of the use of gross multipliers, the American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* (5th ed, 1967), stated at page 337:

"* * * Sufficient accurate data must be gathered on comparable properties which have changed hands in normal transactions at or near the time of the appraisal, before this process can be used with confidence. Preferably the gross income should be from properties fully occupied; that is, the potential gross income at date of sale. Sometimes this data is not available, and it will be necessary for the appraiser to use the actual gross income for the last calendar or fiscal year. So long as the amount for vacancy and loss of rent is not too significant, the multiplier is not affected materially.

"Some appraisers prefer to use the effective gross income estimate which, if the vacancy allowance is 10%, affects the multiplier in the same proportion. However, *the appraiser should know whether the income is actual, effective, or potential gross income, whether the sale price reflects any unusual considerations, and whether the physical comparability with the subject property is close.*

"There is no fixed multiplier for all areas and all types of properties. *Multipliers are useful as general guides in testing comparability in the market data approach. They must be used with great care and only under highly comparable property conditions as to size, operating ratio,*

*etc.* Variations in local conditions and the rate of return expected can produce a general range for the apartment multiplier of from 4 to 8 times the annual gross income, with an occasional range of from 3 to 10. The appraiser should be able to select and apply a multiplier within a range of 5% above or below the median figure, if he is dealing with a closely comparable group of properties." (Emphasis added.)

■ The defendant relies on only two recent sales as comparables. Both of these were parks considerably smaller than plaintiff's park. The evidence does not disclose to what degree or in what way they were otherwise comparable to plaintiff's property or what, if any, special considerations might have been involved in the sales. Little weight can be given to prices on comparables unless there is a sound basis for comparison.[9] Also, there was no evidence as to the details of the sales that might have affected the sales prices —a sale for money or a trade, a sale for cash or on contract or mortgage, what assets were included, what special circumstances may have existed, etc. Furthermore, a study of the county's list of sales of parks in the area reveals no significant basis for comparison and no trend or common factor of size, earnings, location, etc., which makes the sales helpful in selecting a multiplier for plaintiff's property. Although clearly

---

[9] As stated in *McKnight Shop. Center v. Board of Prop. Assess., A. & R.,* 417 Pa 234, 209 A2d 389, 393 (1965):

"In reviewing sales of other property, 'to compare' means to examine the characters or qualities of one or more properties for the purpose of discovering their resemblances or differences. The aim is to show relative values by bringing out characteristic qualities, whether similar or divergent. Thus comparisons based on sales may be made according to location, age and condition of improvements, income and expense, use, size, type of construction and in numerous other ways."

there is a market for mobile home parks, the evidence at trial of the market and of the defendant's comparables was insufficient to show a relevancy between the prices and multipliers of other parks and plaintiff's park. It is the conclusion of the court that in this case use of a gross rent multiplier is not appropriate. Furthermore the evidence concerning defendant's comparables and the market for trailer parks is inadequate to form a basis for a general market approach estimate. The circumstances of this case require the use of other means for determining the true cash value of plaintiff's property.

In an appraisal, the final estimate of value, of course, cannot be an exact amount provable to an absolute certainty. An appraisal cannot be accomplished by mathematics and formulas alone nor can it be mathematically exact. The final conclusion is a reasonable judgment of the fair, probable value based on a proper and logical analysis of the relevant facts. *Knappton Towboat Co. v. Chambers et al*, 202 Or 618, 628, 629, 276 P2d 425, 277 P2d 763 (1954). Likewise, the selection of a particular factor, such as a gross multiplier, capitalization rate or depreciation rate, is a matter of judgment based upon acceptable theory and existing circumstances. It is a matter about which the minds of reasonable men, including the experts, may differ within reasonable limits.[®] It cannot be said, for example, especially

---

[®] In Friedman, *Encyclopedia of Real Estate Appraising* 4 (Rev & Enlarged Ed 1968), it is stated that:

"Two separate, competent, objective appraisals should, as a rule, produce final value estimates with regard to the same property on the same day that are consistent within a range of approximately 5% or less. * * *"

The Department of Revenue feels that a difference of 10 percent

from the record in this case, that either 7 percent for interest or 3 percent for depreciation, is clearly erroneous or manifestly unreasonable. The court finds, however, that the accumulated effect of defendant's several judgment decisions favoring the high side of its appraisal and its primary reliance on the gross rent multiplier approach resulted in a total valuation of plaintiff's property that is excessive and erroneous.

■ Having found the assessment of plaintiff's property to be in error, it is the task of the trial court to decide what the correct assessment should have been. *Georgia-Pacific v. Tax Com.*, 237 Or 143, 152, 390 P2d 337 (1964).

It is the opinion of the court, considering all of the evidence presented by both sides, that the income approach offers the most reliable basis for calculating the value of plaintiff's property on January 1, 1969. In reaching its finding under that approach, the court makes the following computations:

| | |
|---|---:|
| Actual gross income | $132,960 |
| Less actual operating expenses (not including depreciation, interest, property and income taxes) | 63,182 |
| Net operating income | 69,778 |
| Less land rent (8% interest, plus 2½% taxes x $160,000) | 16,800 |
| Reasonable rent on $4,500 worth of personal property | 878 |
| Net income attributable to improvements | $52,100 |

is reasonable and acceptable. This court in *Pacific Building v. State Tax Commission*, 2 OTR 52, 54, affirmed 241 Or 525, 407 P2d 263 (1965), in discussing the advocated 10 percent figure, stated that "* * * the amount of variance allowable is an issue of fact not a rigid rule of law."

The $52,100 net income attributable to improvements is capitalized at 14½ percent (8 percent interest, 4 percent depreciation and 2½ percent taxes) to arrive at a true cash value of the real property improvements of $359,310 under the income approach.

As stated earlier, under the evidence in this case the market data approach should not be used as the primary method of determining the value of the property in question. The market data evidence does convince the court, however, that the true cash value of plaintiff's property is more than the amount indicated by the income approach. Obviously, factors other than net income influence the market for mobile home parks. Defendant's expert testified that such parks are bought on an equity yield basis and that buyers rely heavily on a gross rent multiplier for determination of value. The evidence showed Oak Acres to be a well-managed and maintained park of large capacity with full utilities. Its location is good with vacancy loss below average. From this evidence, the court finds that in its best judgment the value of $359,310 for the improvements as found by the income approach should be increased to the sum of $400,000.

The true cash value of plaintiff's Oak Acres Mobile Home Park for the tax year 1969-70, exclusive of personal property, is set at $160,000 for the land and $400,000 for the improvements, for a total of $560,000.