## PUBLISHERS PAPER COMPANY *v.*
## DEPARTMENT OF REVENUE

John C. Caldwell, Hibbard, Caldwell, Canning & Schultz, Oregon City, represented plaintiff.

G. F. Bartz, Assistant Attorney General, Salem, represented defendant.

Decision for defendant rendered November 8, 1973.

CARLISLE B. ROBERTS, Judge.

Plaintiff has appealed from defendant's Order No. VL 72-399, pursuant to ORS 306.545. After a hearing, the Department of Revenue modified the order of the Multnomah County Board of Equalization, which had found that the true cash value on January 1, 1971, of plaintiff's mill complex, located at 6637 Southeast 100th Avenue, Portland, Oregon, including the land, improvements, machinery and equipment, was $7,546,410. The defendant reduced this to $7,515,410 upon the admission by the county's appraisers of an error giving an overvaluation of $31,000. The plaintiff contends that defendant's value should be further reduced

by \$1,941,031 because of the factor of functional obsolescence.

The mill complex includes both a sawmill and a plywood manufacturing plant, offices, storage and shipping facilities, and other capital improvements, located on a tract of approximately 109 acres. The applicable Assessor's Account Nos. were: 02240-0260, 55100-1540, 55100-1640, 55100-2050, 55100-2100, 55100-2280, 99221-1470, and 99221-1480, all in Code 1; 55100-2280 and 99221-1480, in Code 252; and 99221-1470, in Code 181.

The chief industrial appraiser in the office of the Multnomah County Department of Assessment and Taxation testified that a complete reappraisal was made of the plant in 1969, using the reproduction approach (a variant of the cost approach). Experienced appraisers examined the plant, listing each piece of equipment and each building, describing it, "building up" a cost for each structure, thus determining a valuation for the entire plant by the summation method. Replacement cost (as opposed to reproduction cost) was used as to certain new pieces of equipment recently installed or being installed at the time of the appraisal (where reproduction and replacement costs would have been identical①). "[T]he whole appraisal," according to the witness's testimony, "was made on the lower end of a valuation scale," in recognition of functional obsolescence.

There are three recognized categories of depreciation. They are described in American Institute of

---

① For clarification of the terms "reproduction cost" and "replacement cost," see American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 180-182 (5th ed 1967).

Real Estate Appraisers, *The Appraisal of Real Estate*
61 (5th ed 1967):

"1. Deterioration, or the physical wearing out
of the property.

"2. Functional obsolescence, or a lack of de-
sirability in layout, style, and design as compared
with that of a new property serving the same
function.

"3. Economic obsolescence related to a loss of
value from causes outside the property itself."

The county's appraisers found it necessary to
recognize reductions in value on account of physical
deterioration and of functional obsolescence. This 1969
appraisal was placed on the assessment roll as of
January 1, 1970. The January 1, 1971, assessment
value, the subject of this appeal, was adjusted from the
1970-1971 value because of retirements and additions,
both as to buildings and machinery, and there was an
overall increase based on a trending factor developed
by the Multnomah County Department of Assessment
and Taxation and the Department of Revenue.

The plaintiff and its expert witnesses approved the
appraisal methods used by the county. Both parties
agreed that the market data approach was inapplicable
in this instance for want of acceptable sales of similar
timber processing complexes. They further agreed that
the income approach could not be used because the
plant is only one unit of a closely integrated Pacific
Coast organization with each plant contributing to and
dependent upon all the others, making it impossible to
determine accurately the net income attributable solely
to the subject property.

The sole issue before the court is one of fact. The
court must decide whether the Multnomah County ap-

praisers made a special allowance in a sufficient amount to measure properly the functional obsolescence inherent in the subject property.[2]

The testimony shows that the original sawmill was built in 1924. In accordance with good design at the time, it was designed to straddle Johnson Creek for easy disposal of sawdust and other waste. As a result of new concepts in environmental protection, what was once an accepted expedient has now become a detriment.

The plant area is bisected by 100th Avenue which, in 1924, was a rural road but now is a paved street, carrying heavy traffic. Highway laws require the plaintiffs to use licensed vehicles when traveling on or crossing 100th Avenue and other dedicated streets at the millsite, and this made necessary the use of such vehicles when hauling logs to and from storage and to the millpond. The laws also impose narrow restrictions on size and weight of loads and prohibit the use of more efficient oversize carriers.

The year 1953 marked the first installation of green-and-veneer processing. In 1956, this was enlarged

---

[2] "Functional Obsolescence—Impairment of functional capacity or efficiency. Functional obsolescence reflects the loss in value brought about by such factors as overcapacity, inadequacy, and changes in the art, that affect the property item itself or its relation with other items comprising a larger property. To be distinguished from economic obsolescence. Also, the inability of a structure to perform adequately the function for which it is currently employed."

"Economic Obsolescence—Impairment of desirability or useful life arising from economic forces, such as changes in highest and best use, legislative enactments which restrict or impair property rights, and changes in supply-demand relationships. Loss in the use and value of a property arising from the factors of economic obsolescence is to be distinguished from loss in value from physical deterioration and functional obsolescence." (American Institute of Real Estate Appraisers, *Appraisal Terminology and Handbook* 89, 67 (5th ed, 1967).)

to a plywood plant, with further additions in 1965 and 1966. In 1968, a major fire damaged the operation but the site was not abandoned. The testimony clearly showed an intelligent and aggressive management, utilizing every opportunity to improve and update each operation so that a particular unit, in and of itself, is highly functional. But all parties are agreed that functional obsolescence is inherent in the positioning of the buildings in relation to each other and because of the additional handicaps of Johnson Creek and 100th Avenue. The flow of materials is greatly impaired and overly expensive because of the excess handling of material between buildings, the lack of storage space and the inability to use modern methods of log handling and transport of the finished product.

In recognition of these factors, the Multnomah County appraisers altered their customary procedures under the reproduction method by increasing all depreciation deductions by not less than five percent. This is a standard method in the use of the cost approach. See *The Appraisal of Real Estate, supra,* at 61.

Defendant contends that its method fully recognizes the functional obsolescence and the plaintiff disagrees. The plaintiff's case is based upon a detailed survey by a registered professional engineer (unfortunately, now deceased), a specialist in scientific methods of mill layout, who had made a study, dated March 9, 1972, utilizing the actual site of the present plant but superimposing thereon a model realignment of the manufacturing facilities to achieve an optimum flow of materials to insure efficiency and economy. It contemplated the closing of public streets, a zone change, the elimination of the log pond, and the diversion of Johnson Creek.

After preparing the model realignment, the design engineer prepared studies contrasting the 1971 plant with the model plant, with tables showing the savings in manpower and in machinery (chiefly machinery for handling and moving materials) which would be achieved annually if a model plant could be utilized. The amount in dollars thus developed for the 1971 plant was "an annual extra labor cost of approximately $580,245.00 and requires extra mobile equipment whose value is estimated at $51,800.00 (depreciated basis). The cost of operating the extra equipment is estimated at $106,360.00 per year." The total was capitalized and it was submitted that the sum ($1,941,031) should be deducted from the January 1, 1971, Multnomah County appraisal, notwithstanding and in addition to the county's five percent increase in depreciation intended to cover functional obsolescence.

The aspect of depreciation known as "functional" is placed in two categories: "curable," which can be measured by the cost to cure; "incurable," which is ordinarily measured by a capitalization of the rental loss due to this cause. *The Appraisal of Real Estate, supra,* at 198. In the present case, involving incurable functional obsolescence (which term includes obsolescence where the cost to cure is not economically feasible), the determination of the amount through the capitalization of rental loss could not be utilized because of the impossibility of using an income (rental) approach.

If the functional obsolescence had been confined to outdated machinery or buildings, the amount of value involved could have been achieved through replacement costs. Here, however, we are largely involved with the type of obsolescence that is not structural per se but is the result of a layout of facilities which, with the

growth of the plant, constantly increased the inefficiency of material flow because of problems in location of buildings and storage areas, accentuated by the intersection of the site by busy public streets and Johnson Creek. Functional obsolescence of this nature has been denominated "special functional obsolescence" by the Department of Revenue in its *Industrial Appraisal Manual* (originally published by the Oregon State Tax Commission, Valuation Division, Salem, Oregon, in 1965). The difficulties in arriving at adjustments to true cash value in such cases are recognized in the following paragraph, at 55:

> "In the case of 'special' functional obsolescence, the examples must be clearly or overwhelmingly demonstrated, and they must be substantial in nature. For administrative and technical reasons, there is no feasible way to allow losses in value for multiple, miscellaneous, minor items that are difficult to ascertain or rationalize in the whole production scheme."

Both parties have recognized this special functional obsolescence. The appraisers for Multnomah County used a well-established approach to measure it. Their added allowance of five percent of depreciation, although subjective and not necessarily defensible, except on the ground of custom, has been accepted by the plaintiff as proper except as to amount. The plaintiff's less usual method of measurement is also subject to criticism.[9] Additionally, the court is concerned that the

---

[9] In the past, courts have shunned the use of a hypothetical replacement or "cost-of-substitute" method of appraisal or simulated plant method. See *McCardle v. Indianapolis Water Co.,* 272 US 400, 417-418, 47 S Ct 144, 71 L Ed 316, 328 (1926), in which the court noted: "There is to be ascertained the value of the plant

plaintiff regards the county's additional five percent, ascribable to functional obsolescence, as part and parcel of ordinary physical deterioration (depreciation apart from functional and economic obsolescence) and has added its own total figure for economic obsolescence to the county's figure, raising the possibility of a substantial duplication of amounts deductible for functional obsolescence. The record does nothing to clarify this problem.

The plaintiff produced several expert witnesses whose training and experience command respect. However, the thrust of their testimony in each instance was weakened by their great reliance on hearsay (the Collinson report, the work of an industrial engineer of plaintiff's who was accidentally killed shortly after the hearing appeal to the Department of Revenue). The witnesses had been asked to study the Collinson report

---

used to give the service and not the estimated cost of a different plant. Save under exceptional circumstances, the court is not required to enter upon a comparison of the merits of different systems. Such an inquiry would lead to collateral issues and investigations having only remote bearing on the fact to be found, * * *." See also 2 Orgel, *Valuation Under Eminent Domain* § 198 (2d ed 1953), at 54: "* * * The procedure of estimating the value of an existing property by reference to the probable cost of a more desirable substitute is a difficult one even for the expert, and is subject to a wide margin of error. Yet it is no more difficult, and is subject to less error, than is the procedure of estimating the value of an obsolescent structure by starting with its reproduction cost new and then deducting functional depreciation. Unfortunately, the courts are more likely to appreciate the former difficulties than the latter ones, and they are therefore prone to reject the cost-of-substitute method of appraisal, on the ground that it is too 'speculative', while accepting the cost-of-identical-plant method. * * *" See also *Ore. Portland Cement Co. v. Tax Com.*, 230 Or 389, 369 P2d 765 (1962), (involving economic obsolescence). However, a recent Oregon case recognizes the use of a hypothetical new plant as a basis for measurement of functional obsolescence. *Reynolds Metals v. Dept. of Rev.*, 258 Or 116, 477 P2d 888, 481 P2d 352 (1971).

and to endeavor to corroborate it. Their difficulties in carrying out this assignment are easily understandable and are marked in the testimony by such expressions as: "It's [the plant is] different now than it was then" [when Collinson studied it]; "I think" that a certain reference related to a certain building; the dropping of a millwright from the manning table was not readily supportable, but Mr. Collinson was "probably correct."

Other questions were raised and went unanswered in the testimony. For example: By adopting the Multnomah County appraisers' method, plaintiff adopted reproduction cost as a basis, yet cogent arguments were presented to the court that if a cost-of-substitute method of appraisal (presented by the plaintiff) was to be used, replacement cost (rather than a "taking off" from the reproduction cost found by the county) would have to be used in order to get a clear-cut and defensible figure. This is so because the plaintiff is seeking to compete with the best of modern plants from a functional standpoint and "replacement" deals with function, whereas "reproduction" refers to a duplication of materials in every respect, regardless of functional aspects. The plaintiff's expert witness, Mr. Stewart, agreed with defendant's witness, Mr. Sagar, on this point but excused his use of reproduction cost on the ground that in many instances he deemed those costs to be the same as replacement costs. Since no specification of the breakdown was submitted, the court is at a loss to know to what degree the plaintiff's witness had followed the better method (replacement) and so the force of his testimony was dissipated.

Another example: The realigned plant which was projected as a basis for measurement by the plaintiff involved the use of manning tables, to show the number

of employees who could be dropped from the present manning schedules (this factor representing the largest amount of savings to be gained through a realignment). Mr. Bruss, the experienced appraiser for Multnomah County (who had spent many years in sawmill work as well as in appraising), strongly disagreed with the plaintiff's manning tables and the alleged savings evidenced thereby. On cross-examination, plaintiff's experts agreed that artificial manning is always subjective and they backed away from the deceased engineer's calculations in several instances.

Mr. Bruss also testified that a number of the savings alleged by plaintiff, based upon the manning tables, did not require realignment, and alleged that such problem areas represented curable obsolescence which could more properly be measured by replacement —but none of these suggestions were presented in such detail as to be useful to the court.

Again, the defendant, cross-examining plaintiff's witnesses, brought out that the hypothetical realignment of the plant was not restricted to the proper placement of present structures for economical flow of materials. It also involved the addition of new facilities (e.g., new steam tunnels, a prebarking facility, etc.) but no evidence was produced in court as to the necessary capital outlay. This, of course, denigrated the use of realignment to show functional obsolescence in the flow of materials, because it introduced new elements into the operation without testimony as to measurable adjustments.

Part of plaintiff's argument was that the placement of the original sawmill over Johnson Creek for purposes of waste disposal added to functional obsoles-

cence when it became necessary to install ducts for disposal purposes. The record is obscure on this point and there are contradictions derived from other testimony indicating that a new sawmill had been built over the old one. There was no conclusive evidence to show that the waste disposal factor had not been sufficiently recognized by the county's appraisers. One of the plaintiff's expert witnesses agreed that the sawmill was a relatively new and a well-engineered facility. Unfortunately, the relationship of this testimony to the assessment date, January 1, 1971, was obscure. The preponderance of the testimony showed the sawmill to have been modernized, beginning in 1969. Presumably, the work was completed before the assessment date.

Another example of the sense of uncertainty understandably affecting plaintiff's witnesses related to the engineer's manning tables in which there was an item of "plywood maintenance." Upon being asked to explain this term, one witness stated:

> "I had some—some difficulty with the plywood maintenance because the—the plywood plant is on a vastly different manufacturing program at the present time than it was at the time Mr. Collinson [the engineer] reviewed it. The production is much higher. The number of employees is much smaller and in discussing the maintenance with the highly specialized program you were on at that time with the operating people today, the drop of one millwright on the second shift, while retaining an electrician, didn't really seem as though it would be feasible. * * *"

■ The relief sought by plaintiff is substantial and must be proved by a preponderance of the evidence. The evidence does not support any finding of func-

tional obsolescence in the plaintiff's buildings and machinery contained therein beyond the reduction allowed by the county. Admittedly, the layout of the buildings in relation to each other and the effect of streets and stream impede the efficient flow of materials. The county's appraisers discounted reproduction values for these reasons in an amount which appears reasonable to the court. As stated in 5 Nichols, *The Law of Eminent Domain* § 20.5[4]B (rev 3d ed, Sackman), at 20-55:

> "In ascertaining the ultimate amount to be allowed for functional depreciation it has been recognized that we are dealing with one of those elements' where engineering estimates necessarily cannot be exact and which requires the exercise of a discretion based upon the evidence and upon the judgment of the tribunal. Functional depreciation is not subject to categorical classification. * * *"

The total effect of the gaps, obscurities, and unrelated aspects of much of the evidence submitted by the plaintiff, together with the admissions of plaintiff's witnesses as to the general efficiency, modernity and site amenities of plaintiff's manufacturing complex, require the court to find that the plaintiff has not met that burden of proof which is required by ORS 305.427.[④] The defendant's order is affirmed.

---

[④] ORS 305.427:

"In all proceedings before the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief and the burden of going forward with the evidence shall shift as in other civil litigation."