*[79]
 
 CARLISLE B. ROBERTS, Judge.
 

 Plaintiff, a Nevada corporation, licensed and authorized to do business in the State of Oregon, has appealed from the defendant’s Order No. VL 77-408, dated July 1, 1977, praying that this court set aside the defendant’s order and establish the true cash value of improvements on plaintiff’s Lake Oswego, Oregon, property for the tax year 1975-1976 at $3,500,000 (as of the assessment date January 1, 1975). The property is identified on the records of the Clackamas County Assessor as Account No. 7-02 2S IE 11BB 400. The assessed value for the property established by the Clackamas County Assessor for the year in question was $591,570 for the land and $9,321,890 for the improvements. The Clackamas County Board of Equalization sustained the assessment.
 

 The parties have stipulated that the value of the land, $591,570, and the improvement described as the Agricultural Lime Department, valued at $411,320, are not in dispute. This leaves a value on the assessment roll of $8,910,570 for the buildings and structures and machinery and equipment constituting the plaintiff’s Lake Oswego portland cement plant which plaintiff, in open court, contended should be valued at $5,900,000 (a reduction of $3,010,570 for the cement plant). Plaintiff’s sole appraisal witness testified to a value of $6,275,000 and defendant’s sole appraisal witness found a value of $9,093,230 (excluding the lime plant), a difference of $2,818,230.
 

 Decision in this suit has been rendered doubly difficult by the contrasting strengths and weaknesses of the two principal, opposing witnesses of plaintiff and defendant. Each appears honest and competent. However, plaintiff’s Mr. Wolfe is a retired engineer with an unexcelled technical knowledge and practical experience in the portland cement industry and little or no experience as a property tax appraiser. Mr. Honeysette is an industrial engineer employed by the defendant who is familiar with the property tax appraisal process
 
 *[80]
 
 but has only a superficial acquaintance with the port-land cement industry. Mr. Honeysette was able to gamer only a modicum of hard facts on which to rest his appraisal value.
 

 Mr. Joseph M. Wolfe, plaintiffs expert appraiser, described himself as a "cement engineer” of 40 years’ experience. Mr. Wolfe obtained his Bachelor of Science degree in mining engineering (Lehigh University 1935). He worked for 15 years (1935-1950) with Allis-Chalmers Manufacturing Company, Milwaukee, Wisconsin, in the design of cement plants and equipment selection, preparing proposals, making sales, engaging in engineering and equipment installation. During the next four years, he was assistant chief engineer of Traylor Engineering and Manufacturing Company, Allentown, Pennsylvania, designing machinery and preparing flow sheets and layout of mineral processing plants. During 1955-1958, he was chief engineer and manager of all engineering programs for Missouri Portland Cement Company, St. Louis. He then joined Bendy Engineering Company, St. Louis (a specialist in the portland cement field), as a vice-president and project manager, engaged in engineering and process development, economic studies and cement plant evaluations, coordinating design work with client requirements, and providing general management of engineering office operations. During 1970-1974, he was president and director of design for Bendy Engineering Company and then retired, remaining a senior consultant.
 

 Mr. Wolfe’s assignment for the plaintiff was to appraise the plaintiff’s Lake Oswego cement plant property and to give his opinion of its true cash value as of January 1,1975, exclusive of the land and of the agricultural lime rock portion of the plant. After Mr. Wolfe’s introduction and the presentation of some testimony, counsel for defendant objected to his appearance as a witness on the ground that he was not qualified to value property for ad valorem tax purposes. The court reserved judgment on the objection.
 
 *[81]
 
 In its decision, the court has utilized much of Mr. Wolfe’s testimony, convinced by his integrity and by the court’s conviction of his superabundant factual knowledge and understanding in the premises.
 

 Operation of the cement plant began in 1916. Over the years, it has been renovated several times, principally in 1947, 1956 and 1967. Mr. Wolfe described the plant negatively as one with "dispersed facilities and a very circuitous flow—flow pattern. * * *” Upon examination of the charts supplied by the witnesses (PI Ex 1; Def Ex A), picturing the arrangements of the present plant and a hypothetical modem plant, no engineering experience is required to recognize plaintiff’s problems of obsolescence.
 

 In the Lake Oswego plant, the raw materials used in the production of cement (approximately 85 percent limestone, 14.5 percent of silica sand, and one-half of 1 percent iron ore) are ground to a fine powder and carried in a slurry to the kilns. In modem plants, this wet process has been replaced by a dry process (when the nature of the raw materials permitted), with a tremendous reduction in the amount of fuel otherwise required for drying the slurry for the production of clinkers. The material used in the Lake Oswego plant is suitable for use in the dry process.
 

 Mr. Wolfe’s appraisal methodology is outlined in PI Ex 1, with amendments and corrections in PI Exs 2 and 9. He first reviewed Bendy’s report of the subject property for 1963. In mid-October 1975, he completely "toured” the plant, observing the grade and condition of the facilities, the operating situation and the deployment of manpower. He studied the economic position of the subject property vis-a-vis a modem plant and acquainted himself with the Oregon State Tax Commission’s
 
 Industrial Appraisal Manual
 
 (1965; with cost factor updates to April 1, 1978).
 
 [1]
 

 
 *[82]
 
 Following his observation and studies, utilizing records available to him in the St. Louis office of the Bendy Engineering Company,
 
 [2]
 
 he determined that the reproduction cost new of the subject property, as of January 1, 1975, would be $22,200,000 and the replacement cost new, $23,900,000. He did not bring to the court the data on which he based his conclusions but the court was impressed with his apparent knowledge and long experience in the cement manufacturing business and by his confidence in Bendy’s data files.
 

 Mr. Wolfe’s testimony indicated that the subject plant, in common with all cement plants, had substantial "deterioration” (50.1 percent depreciation by his estimate) due to the abrasive nature of the raw materials necessarily used, and, in addition, the plant had suffered very substantial functional obsolescence, particularly in those aspects which resulted in exceptional fuel and labor costs as compared to a modem plant.
 

 Assuming that the present plant’s optimum output during the calendar year preceding January 1, 1975, was 360,000 tons, he noted that the present plant requires three raw mills, three kilns, and two cement mills to achieve such production, whereas a modem plant could produce two or three times as much cement
 
 *[83]
 
 with one raw mill, one kiln, and one cement mill, with a net decrease in expenditures for manpower and fuel.
 

 Plaintiff’s cement mill is not only old and poorly arranged, it is also a small producer. Its highest production in its history has been 304,000 tons. On 1975, in order to meet the demand for its product, it bought 17,000 tons of finished cement from other cement producers for resale to its customers.)
 

 Mr. Wolfe testified that it was not feasible to obtain modem machinery for a plant of less than 500,000 tons production per year. However, holding in mind that no one would seek to reproduce the present plant, he undertook to develop a model replacement plant, using modem engineering, equipment and design, seeking to duplicate, as nearly as possible, the present plant’s production. A plot plan in the Appendix to PI Ex 1 shows the arrangement of a replacement for the present plant which is designed to be comparable in quality and capacity but utilizes modem equipment and uses the dry process. It would be equipped with a suspension preheater kiln whose hot waste gases are utilized to dry the raw material. "This processing assembly represents the latest technology for thermal efficiency in clinker production. * * *” (PI Ex 1, at 8.) The replacement cost new of the model plant is shown in detail in PI Ex 1, at 13, and totals $23,900,000. For the purpose of capitalization over the remaining useful life of the present plant of depreciable items, he added to this sum a capital expenditure as of 1975 of $1,500,000 for coal burning facilities in plaintiff’s 1975 conversion of its kiln No. 4 to coal fuel, to total $25,400,000. (PI Ex 9.)
 

 His examination of the present plant led Mr. Wolfe to conclude that it had "deteriorated” (physically depreciated) 50.1 percent (as noted above) and, consequently, this weighted average of deterioration was applied against the replacement cost, reducing that amount by $12,725,400 to $12,674,600.
 

 
 *[84]
 
 From the depreciated value, he deducted the functional obsolescence by measuring the labor and the fuel costs which would be saved by the use of the replacement plant. His consideration of this problem is set out in PI Ex 1, at 14-18. His original computations are found in PI Ex 1, at 19-21. (He recognized that factors other than labor and fuel could be developed but deemed these two as truly significant.) However, corrections were made in PI Exs 2 and 9 and the final values determined are listed and explained in PI Ex 9.
 

 Total payroll cost for the present plant was found to be $7.77 per ton of cement produced (on a 300,000 tons per year base) and in the replacement plant such cost would be reduced to $4.56, an excess labor cost of $3.21 per ton. The excess cost of fuel per ton is found to be $4.04, making a total excess cost per ton of $7.25, from which added depreciation for the model plant ($2.29 per ton) and additional taxes on account of the model plant of $2.48 per ton must be deducted. This leaves $2.48 excess cost times 300,000 tons equals $744,000, which, capitalized at a 9 percent rate over a 13-year remaining life of the present plant as of the assessment date, leads to multiplier of 7.5035 and a capitalization of functional obsolescence in the sum of $5,582,604. This amount, deducted from the depreciated replacement cost of $12,674,600, with a further deduction of $818,000 (representing the annualized cost of the plaintiff’s conversion of the No. 4 kiln to the use of coal as an addition to the model plant in 1975, deductible because it did not exist in the subject property as of January 1, 1975), leaves a true cash value of the subject property, as of January 1, 1975, of $6,273,996, which Mr. Wolfe rounded to $6,275,000.
 

 In argumentative support of his conclusion, Mr. Wolfe utilized "two alternative methods.” In the first alternative, he evaluated each "process complex” in the cement plant, "refined” by his conclusions as to such factors as age, condition, technology, performance, layout, production costs, obsolescence, and remaining life, to reach a true cash value of $6,770,000.
 
 *[85]
 
 No data were presented, Mr. Wolfe again relying on his Bendy files and experience.
 

 Mr. Wolfe’s second alternative made use of the Department of Revenue’s maintenance appraisal records (based on the plaintiff’s annual Real Property Return to the defendant, Department of Revenue Form No. AA-C-31), in which the department calculated a depreciated replacement cost of the plant, with deductions for its functional obsolescence, depreciation and taxes, of $9,321,890. Mr. Wolfe concluded that the defendant had accounted for some but not all of the functional obsolescence, underestimating it by $4,134,048, a sum which Mr. Wolfe deducted to obtain a true cash value of $5,187,842.
 

 Mr. Wolfe is a bona fide expert in the design and construction of cement plants. The court has confidence in his measurements of the physical depreciation and functional obsolescence in the buildings, machinery, equipment and layout of the subject plant. Based on the record made in this suit, the court believes that Mr. Wolfe lacks training as a property appraiser and is not familiar with the language, techniques and responsibilities assumed by the typical property appraiser who has taken the basic courses leading to the designation M.A.I. (an appraiser certified by the American Institute of Real Estate Appraisers). His learning in this respect appeared to be limited to a study of the
 
 Industrial Appraisal Manual, supra,
 
 an excellent work of its kind but one which is better used after a grounding in the established treatises of the American Institute of Real Estate Appraisers and International Association of Assessing Officers, as well as the volumes on property appraisals written by Bonbright and Ring and the material edited by Friedman.
 

 Consequently, Mr. Wolfe failed adequately to advise the court on the applicability of the three standard approaches to value, to advert to economic ob
 
 *[86]
 
 solescence
 
 [3]
 
 (possibly pertinent in today’s clime of environmental concern), and to avoid speaking
 
 ex cathedra
 
 (failing to implement his conclusions with acceptable testimony of sources of information and the work sheets which would illustrate his concepts). He presented a written appraisal report which was skeletal and had to be twice revised in important particulars, as the witness became better informed of the demands of his assignment.
 

 Nevertheless, Mr. Wolfe’s appraisal concept as used in this suit is acceptable. It is stated in the
 
 Encyclopedia of Real Estate Appraising
 
 (Friedman ed, rev & enlarged ed 1968), at 457:
 

 "The appraiser must place himself in the position of a potential
 
 user
 
 of the subject property. What criticisms would the prospect have of the property as it now exists? How difficult would it be to adapt the property to his needs? The appraiser’s interpretation of value in this case leans toward the
 
 functional utility
 
 concept, that is, the ability to provide usefulness or service. This is reminiscent of the 'value in use’ concept.”
 

 And, again, at 454-455:
 

 "Another cause for the greater average annual obsolescence rate of industrial property is the ever-changing industrial scene. Modernization of manufacturing and handling methods, and a changed attitude toward workers, have taken place over the past decades. Production line techniques and automation on the one hand, and employee comfort and safety on the other, have been forcing industry to abandon older structures in favor of more modem installations. Many buildings erected less than 20 years ago can no longer compete with newer structures. A major portion of the loss in value must be attributed to functional obsolescence, not to wear and tear.
 
 To measure this loss, the appraiser must compare modem constmction in the field to his
 
 
 *[87]
 

 subject property and evaluate the latter’s shortcomings.
 
 ” (Emphasis supplied.)
 

 At 476-477:
 

 "Obsolescence may sometimes be evaluated by putting a price on inefficiency. For example, in a warehouse with a ten-foot ceiling height, it may be possible to estimate loss to the warehouse operation stemming from the inability to use or to obtain the maximum benefits of pallet stacking.”
 
 [4]
 

 Mr. Wolfe has followed the general precepts of
 
 Reynolds Metals v. Dept. of Rev.,
 
 258 Or 116, 477 P2d 888, 481 P2d 352 (1971), and
 
 Publishers Paper Co. v. Dept. of Rev.,
 
 270 Or 737, 530 P2d 88 (1974), as understood by this court, in determining functional obsolescence.
 

 The expert appraisal witness for the defendant was Mr. Lloyd G. Honeysette, who, during the last 15 years, has been an appraisal engineer in the Industrial Section, Assessment and Appraisal Division, Department of Revenue. Mr. Honeysette is a graduate of Oregon State University, with a major in industrial engineering, a minor in business administration. He is designated a senior appraiser of machinery and equipment by the American Society of Appraisers, and has attended property valuation short courses and appraisal seminars. He has been an estimator, engineer and draftsman for construction companies, and has assisted or conducted industrial appraisals for the defendant, including many timber, paper, and lumber companies, but his only appraisal of cement plants was in connection with the property of the plaintiff. As a part of his preparation therefor, he had made a series of visits, walking through portland cement plants in Washington and in California, but he did not obtain a finished education through this laudable effort. (Plaintiff stresses that Mr. Honeysette had never been
 
 *[88]
 
 in a plant which used a suspension preheater!) The testimony makes clear that he is better prepared in the vocabulary and technique of property appraisals than is Mr. Wolfe but carries little of Mr. Wolfe’s authority (based on long and continuous experience with an engineering firm specializing in the subject) respecting the minutiae of a cement plant’s design, equipment, operation, and costs. Unfortunately, his host plants were reluctant to give him information, particularly as to operating costs. (This was not true at the subject plant.)
 

 In preparation for this suit, Mr. Honeysette prepared a new written appraisal and made a detailed inspection of the plaintiff’s Lake Oswego plant, obtaining data from the plaintiff’s records and through interviews with some of its officers. In addition to the visits to Washington and California cement plants, mentioned above, he made telephonic inquiries of officers and managers of other plants in the contiguous states and Hawaii. However, the court heavily discounts his oral testimony from such sources because of his own lack of foundation and the indefiniteness and incompleteness of the information given him.
 

 Mr. Honeysette, knowledgeable as to the normal requirements of a property appraiser, gave thought to the three normal approaches to value and stated (Def Ex A, at 4):
 

 "The income data approach was considered but was not used in this appraisal because allocating income and expenses to the subject property, one of three facilities owned and operated by Oregon Portland Cement Company, would not produce a reliable indicator of value. The market data approach was considered but not utilized to conclude a value estimate.”
 

 (It must be assumed that the market data approach was not used because of the defendant’s inability to obtain sales of comparable properties. As stated in
 
 Ore. Portland Cement Co. v. Tax Com.,
 
 230 Or 389, 393, 369 P2d 765, 767 (1962): "There is, of course, no established market for cement plants, * * *.”) He also
 
 *[89]
 
 gave consideration to economic obsolescence but concluded that, if any existed, it was not measurable. And he properly recognized that the plant was subject to substantial "special functional obsolescence.” He drafted a schematic replacement plant (Def Ex A, at 36a); however, it clearly lacks the authority of that prepared by Mr. Wolfe (PI Ex 1).
 

 The witness basically followed the same approach as that used by Mr. Wolfe; i.e., the study of the replacement cost, utilizing a modem plant as a model. His determination of reproduction cost appears to be based on the maintenance records gathered annually by the defendant in those tax years in which no physical reappraisal takes place, as permitted by statute. ORS 306.126; 308.234; 308.285. This is essentially historical cost less depreciation. He personally observed the physical deterioration and found the buildings and structures 52 percent good (Def Ex A, at 34) and the machinery and equipment 58 percent good (Def Ex A, at 35), in contrast to Mr. Wolfe’s 49.9 percent (100 — 50.1 percent depreciated).
 

 Mr. Honeysette made a particular study of the cost of labor, fuel, power, operating supplies, and property taxation (on a per ton production basis), both for the subject property as of the assessment date and for the model replacement plant. This was for the purpose of eliminating the "special functional obsolescence” found in the subject property to be used as a further deduction from the replacement cost new less depreciation of the replacement plant.
 
 [5]
 

 
 *[90]
 
 Turning to Mr. Honeysette’s replacement plant cost estimate (Def Ex A, at 32-36), the court finds the data relatively tenuous.
 

 In order to determine the nature and the cost of a replacement plant, the witness first undertook to determine the production of the present plant as of the assessment date (after which he would "order” the modem machinery capable of "replacing that utility of the subject plant in a location with comparable surrounding conditions under similar circumstances”). (Def Ex A, at 32.) He found that the subject plant produced 309,007 tons of finished cement in 1974, utilizing kiln Nos. 2, 3 and 4. As stated above, the testimony shows that the subject property never produced more than 304,000 tons of cement in any year prior to January 1, 1975, and, in 1975, 17,000 tons of cement were purchased in the market to satisfy the demands of the plaintiff’s customers. However, by breaking down the tons per year to each kiln’s potential production of tons per day and multiplying the number of tons by 310 days (which he found to be the optimum time for the utilization of a kiln in any year), he found that the subject property "can produce 380,000 tons per year. * * *” (Def Ex A, at 32.)
 

 In support of this figure, Mr. Honeysette relied upon a letter from the Oregon Portland Cement Company, dated April 21, 1971, which indicated the
 
 kiln
 
 capacity. Subsequent testimony of the plaintiff’s witness, Mr. Earl Wheeler, comptroller of the Oregon Portland Cement Company since 1973, corroborated the conclusion that a 300,000 tons per year production of the plant was realistic as of January 1, 1975, because of the bottleneck created by the raw grinding facilities which had a capacity for only 300,000 tons per year (Tr 352). This handicap was not corrected until 1976, when the grinding facilities were enlarged to provide for 360,000 tons (Tr 359), at a cost of $600,000 (Tr 364). (A former bottleneck, the finished cement storage facilities, had been enlarged in 1974 to make 360,000 tons of production possible, beginning in
 
 *[91]
 
 the year 1975 (but following the pertinent assessment date).) (Tr 363-364.) The court concludes that Mr. Honeysette’s 380,000 tons per year is excessive and improperly affects the calculations based thereon.
 

 However, Mr. Honeysette, like Mr. Wolfe, found that it was not possible to obtain figures for a new plant which would produce finished cement in a quantity of less than 500,000 tons per year. (Tr 234.) The only cost estimate he was able to obtain of a modem 500,000-ton plant, using the dry process and with coal as its primary fuel, was in a letter, dated April 30, 1975, from F. L. Smidth & Company, Inc., of New Jersey, directed to the Oregon Portland Cement Company, containing a "close estimate of the cost of the [plaintiff’s machinery and equipment for a] proposed new plant at Durkee” in Eastern Oregon. This plant was designed as "a modem dry process plant, using a kiln with Unax planetary coolers and equipped with a four-stage cyclone preheater for maxium fuel economy.” The estimate covered all the equipment in an enclosed list and the anticipated cost of process engineering and drawings as a basis for bids on civil engineering and construction. The estimated total cost of this preliminary proposal, relating to machinery and equipment, was $12,742,700 f.o.b.
 

 Mr. Honeysette stated in his testimony (Def Ex A, at 32; and
 
 see
 
 Tr 234-235):
 

 "* * * The manufacturers of cement plant machinery and equipment and engineering firms that design cement plants, estimate that purchased equipment represents from 30 percent to 40 percent of the cost of a cement plant.”
 

 In his appraisal report, the witness inadvertently changed the purchase price of the equipment for a 500,000 tons per year capacity plant from the Smidth figure of $12,742,700 to $12,472,700 and, using a "six-tenth’s factor” formula, reduced the 500,000 tons per year plant cost to an alleged 380,000 tons per year plant cost wherein the purchased equipment represented, respectively, 30, 35 and 40 percent of the total
 
 *[92]
 
 plant cost. (The multiplier was based on a fraction of 380.000 tons/500,000 tons to the .6 power which, using logarithmic tables, developed a multiplier of .848 (Tr 283-284).) Using this formula (which Mr. Honeysette testified was the method for estimating process equipment and plant costs found in
 
 Cost Engineering in the Process Industries,
 
 1960), he reduced the 500,000 tons per year plant costs to 380,000 tons per year plant costs, respectively, of $35,256,000 (with M & E as 30 percent of the total), resulting in a cost per ton of the annual production of $92; $30,230,000 (M & E at 35 percent of total cost), with a cost per ton of annual production of $79; and $26,440,000 (with M & E at 40 percent of plant cost) and a cost per ton of annual production at $70.
 

 Choosing from these figures, Mr. Honeysette determined a replacement plant cost by multiplying 380.000 tons per year by $70 ("because other data considered tended to substantiate that conclusion”) (Tr 236), to which sum he added the subject property’s barge loading and receiving facilities at $150,000 and $950,000, respectively, for a total replacement plant cost estimate of $27,700,000. (It will be recalled that Mr. Wolfe estimated $25,400,000. PI Ex 9.)
 

 On the basis of his reproduction cost new and his determination of the physical deterioration in the buildings and structures of the subject property, as of January 1, 1975, he used a "52 percent good” multiplier (which he testified was a composite figure based upon observed physical deterioration of varying amounts in different work centers, as shown in Def Ex A, at 10-19), to obtain a depreciated reproduction cost of $4,700,700 for the buildings (Def Ex A, at 34). Using a composite figure obtained from Def Ex A, at 20-31, he used a 58 percent good multiplier to obtain a depreciated reproduction cost of machinery and equipment of $10,804,560.
 

 Mr. Honeysette, having used his model plant to obtain a replacement cost new, as of January 1, 1975,
 
 *[93]
 
 reduced by the amount of depreciation indicated by the observed condition of the subject property (based upon the reproduction cost new approach), testified that he had thus eliminated functional obsolescence from consideration because there is theoretically no functional obsolescence in a new, model plant. However, he made another adjustment to eliminate "special functional obsolescence” which he recognized was present in the subject plant, even after the elimination of functional obsolescence.
 

 A definition of "functional obsolescence,” universally accepted, is found in American Institute of Real Estate Appraisers,
 
 Appraisal Terminology and Handbook
 
 (5th ed 1967), at 89:
 

 "Impairment of functional capacity or efficiency. Functional obsolescence reflects the loss in value brought about by such factors as overcapacity, inadequacy, and changes in the art, that affect the property item itself or its relation with other items comprising a larger property. To be distinguished from economic obsolescence. Also, the inability of a structure to perform adequately the function for which it is currently employed.”
 

 The only definition of "special functional obsolescence” which the court has been able to find is in the Oregon State Tax Commission’s
 
 Industrial Appraisal Manual, supra,
 
 at 55. A definition of functional obsolescence is found therein, with examples, after which there appears:
 

 "Another type of obsolescence that is neither structural nor economic in nature may be referred to as a special functional obsolescence which involves circumstances frequently peculiar to manufacturing or processing plants. * * *”
 

 There follows a list of examples, which, on first reading, seem to fit comfortably within the accepted definition of functional obsolescence, but these examples are useful in better acquainting the reader with the breadth and depth of the concept. The Department of Revenue’s material affords a stimulus for the property
 
 *[94]
 
 appraiser to recognize that all of the functional obsolescence of an outmoded plant may not be accounted for through the rather mechanical device of comparing the subject plant’s reproduction cost new less depreciation against the replacement cost new less the depreciation observed in the subject property.
 

 In determining his special functional obsolescence, Mr. Honeysette made comparisons between the Lake Oswego plant and his proposed replacement plant for the year 1974 (before coal-fired conversion of kiln No. 4) and repeated the process for 1975 (after the conversion of kiln No. 4 to coal firing), taking account of labor, fuel, power, operating supplies, property tax, and depreciation. Having determined that the present plant has a useful life of 15 years (as contrasted to Mr. Wolfe’s 13 years), he found that the excess cost per ton in the present plant for the first year was $5.35 and for the remaining 14 years, $4.27 per year, which gave a weighted excess cost per ton of $4,345 (as compared to Mr. Wolfe’s $2.48) for producing the cement at the present plant. Multiplying this amount by 309,007 tons (his concept of the plant’s highest actual production in a year), he found a total of $1,344,180 of annual excess operating costs. Making adjustment for income tax (at a 39 percent rate) which the corporation would have to pay in the way of annual taxation, he rounded the annual excess operating cost to $820,000. Mr. Honeysette’s present worth factor at a 9 percent rate for 15 years was 8.0607, resulting in functional obsolescence of $6,609,770 as opposed to Mr. Wolfe’s $5,582,604.
 

 Utilizing his total replacement plant cost of $27,700,000 and deducting $11,997,000 for physical deterioration and $6,609,770 for special functional obsolescence, he determined a market value as of January 1,1975, for the cement plant of $9,093,230 (as contrasted to Mr. Wolfe’s $6,275,000).
 

 It appears to the court that Mr. Honeysette’s methodology, above described, in which he made use of
 
 *[95]
 
 more cost items than Mr. Wolfe (labor, fuel, power, operating supplies, property tax, and depreciation) and offset the power costs for the present plant and for the replacement plant against each other, may be superior, but it does not sufficiently affect the final results in the present case to require a change in the calculations of Mr. Wolfe.
 

 As stated above, the two appraisal witnesses were very differently equipped to carry out their important function. They were each shown to have made significant errors in preparation. The court strongly censures the lack of work papers and other substantiating material which is ordinarily proffered by expert appraisers for the court’s perusal. If this fault had not been shared by both witnesses, it alone could have been decisive in some cases. However, the court’s duty is to determine what constitutes the preponderance of the evidence submitted (a determination of that body of testimony which is "more likely” to be right and which brings greater conviction).
 
 0See
 
 33 West, Words and Phrases,
 
 Preponderance of Evidence
 
 586 et seq. (1971).) This does not require the court to produce a mathematically correct decision.
 

 As stated above, Mr. Wolfe came to his task with an extraordinary amount of experience in matters pertinent to the valuation of a cement plant but without the ordinary accouterments of the trained appraiser. Nevertheless, he used a proper approach to value and unquestionably had greater expertise than defendant’s witness in the hypothesizing of a replacement plant and in determining the percent good of the buildings, machinery, and equipment in the present plant. The court believes that, in comparison with Mr. Honeysette, his long familiarity with the subject matter of this trial better equipped him to determine the utility of equipment and buildings in the subject property. He was better able to measure deterioration, obsolescence, remaining life and "percent good.” He was more conversant with original costs and replacement costs of obsolete and new cement plants.
 

 
 *[96]
 
 Mr. Honeysette, although better prepared as to methodology, came to the court as a tyro in the valuation of cement plants and laid a very precarious foundation for the establishment of his values. In this difficult case, in which both appraisal witnesses unquestionably are men of character, the preponderance of the evidence is, in the court’s view, unquestionably on the side of the plaintiff.
 

 The assessed value of the plaintiff’s cement plant is in excess of the true cash value, which, as of January 1, 1975, is held to be $6,275,000. The value of the lime plant is stipulated to be $411,320. The defendant’s Order No. VL 77-408, dated July 1, 1977, must be modified accordingly. The value of the land, $591,570, remains unchanged. The Assessor and Tax Collector of Clackamas County are required by this decision to amend the assessment and tax rolls for the tax year 1975-1976 in accordance herewith. If it is found that the plaintiff has overpaid its taxes, the excess payment plus interest thereon shall be refunded to the plaintiff by the Clackamas County Commissioners in accordance with the provisions of ORS 311.806 and 311.812. Each party shall bear its own costs.
 

 [1]
 

 Counsel, in a pretrial Def Ans Br 2, filed March 17,1978, stated: "The Department’s Industrial Appraisal Manual is no longer in effect for the
 
 *[82]
 
 citations claimed by plaintiff.” However, the Tax Court’s library copy of the official publication contains a series of updates, the last dated April 1, 1978, long after the appraisal date of the subject property, with no hint of change except for cost modifiers reflecting inflation. Its use in the present suit appears to be legitimate.
 

 [2]
 

 Defendant has sought to impeach Mr. Wolfe’s testimony respecting the cement machinery and equipment manufactured in the United States and used in construction of a small plant in Guatemala, but the court finds that the manufacturer’s sales prices of this modem machinery are useful in testimony because they were f .o.b. the manufacturer and the witness made his own adjustments for shipment and installation of similar machinery in Oregon. (In this instance, as in others, the witness failed to bring into court his memoranda, work sheets, and other supporting data, in aid of his oral testimony, but he referred to his reliance on Bendy’s voluminous files, developed in its cement plant work.)
 

 [3]
 

 "Economic obsolescence” is now being referred to as "environmental obsolescence” by some authorities.
 
 See
 
 Am Inst of Real Estate Appraisers,
 
 The Appraisal of Real Estate
 
 (7th ed, rev 1978), at 251. The subject property was early established on a site adjacent to lands which have subsequently developed into an expensive scenic, residential area.
 

 [4]
 

 See The Appraisal of Real Estate, supra,
 
 n 3, 252-256; Ring,
 
 The Valuation of Real Estate
 
 186-187, 192 (2d ed 1970); Inti Assn of Assessing Officers,
 
 Assessing and the Appraisal Process
 
 52, 58 (5th ed 1974); I Bonbright,
 
 Valuation of Property
 
 177-189 (1937).
 

 [5]
 

 Mr. Honeysette prepared his appraisal report to include all the improvements at the Lake Oswego site of the plaintiff; i.e., both the cement plant and the agricultural lime plant. The land itself was appraised by Clackamas County and its value has not been disputed. The agricultural lime facility was given a true cash value as of the January 1, 1975, assessment date of $411,320 and this value has not been contested. Consequently, the total values found by defendant’s witness, as evidenced in Def Ex A, have been amended, as necessary, in this decision by the deduction of the agricultural lime facility value at the agreed value of $411,320.
 
 See
 
 Def Ex A, at 38.