CARLISLE B. ROBERTS, Judge.
 

 The Oregon Bank, an Oregon banking corporation, appealed from the Department of Revenue’s Order No. VL 78-264, dated May 24, 1978. The question presented is the true cash value of a newly constructed banking facility in Eugene, Oregon, as of the assessment date, January 1, 1977.
 

 The property is located on the southwest corner of the intersection of 11th Avenue West and Garfield Street, with a street address of 2000 West 11th Avenue, Eugene, Oregon. Its legal description is Lots 1,2 and 3, Block 10, Chambers Addition to Eugene, in Lane County, Oregon. The County Assessor of Lane County describes it as "Map No. 17-04-36-32, Tax Lots 100, 200, 300; Account Nos.: 200483162, 200483170, 200483188.”
 

 Prior to the bank’s acquisition of the property, the City of Eugene changed the course of Garfield Street, on the east side of the subject property, altering its straight north-south direction by gently curving the street in an easterly direction to avoid a jog at the 11th Avenue and Garfield intersection. Whereas the subject property had been a "comer lot” in the usual sense of that term prior to the change, thereafter the sidewalk and curb space was somewhat enlarged on the eastern side of the bank’s lots. After the plaintiff
 
 *[293]
 
 acquired the property and prepared to build thereon, the City of Eugene, as a condition to issuing the necessary building permit, required the bank to extend its own landscaping by filling and landscaping the city’s part of the property, and, in effect, extending its lawn sprinkler system and landscaping into the city-owned 6,850 square feet (19 percent of the total of bank and city ownership). The bank, of necessity, built curbs, sidewalks and drains, and relocated sanitary and storm sewer systems.
 

 The testimony indicated that banks seek to build structures which attract attention and present an image, and the subject building was no exception. Its shape is a right-angled triangle with the bank’s vault extruding laterally from the center of the hypotenuse. Although the area’s appearance is enhanced by extensive landscaping, there is adequate auto parking space.
 

 There is no dispute as to the true cash value on January 1, 1977, of the bare land itself. The plaintiff contends that the improvements to the real property should not be valued in excess of $148,694, whereas the Department of Revenue found a true cash value of $216,560.
 

 Mr. R. J. Henry was the plaintiff’s principal witness on value. (Mr. Gayle Makin, an Assistant Vice President of the plaintiff, preceded Mr. Henry as a witness and his testimony has been given full consideration with Mr. Henry’s, the same points having been raised by each witness.) Mr. Henry qualified as an expert property appraiser, presenting a record of six years of employment with the Department of Assessment and Taxation, Multnomah County, Oregon, where he specialized in commercial-industrial appraisals, including the valuation of bank property. During the last three years he has been employed by The Oregon Bank, appraising multifamily, industrial and commercial properties. He studies the plans for proposed property improvements to determine their feasibility and
 
 *[294]
 
 then inspects the projects during construction to guarantee conformity with the plans. He had made an appraisal of the subject property.
 

 The defendant’s expert appraiser was Mr. William A. Dilg, a certified appraiser employed by the Department of Assessment and Taxation of Lane County who has had four years’ experience appraising residential property and six years of experience in the county’s commercial and industrial section. He also prepared a written appraisal of the subject property.
 

 Both experts agreed that the highest and best use of the land was the use developed by the bank. They also agreed that the market data approach could not be used because of a lack of sales of branch bank structures comparable in location, age and size. They concurred that the income approach could not be used because of the lack of any history for the subject property and the difficulty in obtaining data of competitive market rents and expenses of other similar properties on which to base an income approach. On the basis of the testimony, the comb deems these conclusions to be acceptable in this case. The cost approach was relied upon by both plaintiff and defendant.
 
 Cf Valley River Ctr. et al v. Dept. of Rev.,
 
 6 OTR 368 (1976).
 

 Both Messrs. Henry and Dilg had access to the plaintiff’s actual costs of construction. Mr. Henry, however, modified the actual costs by using a Marshall-Stevens valuation base, placing the bank building in the "average” class (on a scale of "fair,” "average,” "good”), which, with other adjustments, resulted in an estimated value of $148,694 for the improvements as of January 1, 1977. He made a point that the bank had lost its advantage as a comer location because of the city’s enlargement of the curb space.
 

 Mr. Henry claimed a functional obsolescence of 21 percent of the building costs, based upon the triangular form of the bank building as opposed to the typical
 
 *[295]
 
 rectangular construction, testifying that this unusual form gave rise to many odd comers and poor arrangement for banking purposes. His economic obsolescence of five percent of building costs was based upon a "neighborhood analysis” derived from a 1975 projection of 1970 census data which led him to conclude that the bank had been placed in an inferior location.
 

 Mr. Dilg’s cost approach is best described by setting out page 14 of Defendant’s Exhibit A, as follows:
 

 "The replacement cost of the subject improvements is best supported by The Oregon Bank’s actual cost to build figures, as outlined here: (See attached letters and source information).
 

 ITEM COST SOURCE
 

 Cost of Building Shell
 

 (General Contract) $134,532 A.I.A. Document
 

 Bank furnished (outside of general contract):
 

 Vault Door $12,775 Bank letter 4/27/77
 

 Night Depository 3,135 B of E petition
 

 Drive-Up Window 8,300 B of E petition
 

 Diebold Systems 11,832 B of E petition
 

 Teller Counters
 

 (cages) 8,400 (estimate)
 

 Alarms 6,909 Bank letter 4/27/77
 

 Irrigation 2,800 Contractor
 

 Landscaping 4,700 Contractor
 

 Architect Fees 13,450 Architect
 

 Bank Furnished: $ 72,301
 

 Cost of Construction (less interest on money) $206,833
 

 Estimate of interest on construction money 14,085
 

 TOTAL COST OF SUBJECT IMPROVEMENTS $220,918
 

 ROUNDED $220,920
 

 "The actual general contract (Gale M. Roberts, General Contractor) cost of the building: shell
 
 prior
 
 to the installation of the additional bank furnished real property items,* such as vault door, night depository, drive-up window and equipment, teller counter, etc. totalled $134,532 (See A.I.A. document G702 and Gale M. Roberts Co. billing Job 8090 to The Oregon Bank) or $58.19 general contract cost per square foot (2,312
 
 *[296]
 
 square feet). [^Footnote: See property status of financial institutions, attached.]”
 

 The plaintiff, generally, recognized the accuracy of these actual costs (which it admitted were $203,470) but disputed a number of points as follows:
 

 Plaintiff argued that the architect’s fees of $13,450 did not add value to the improvements and should be disregarded. This argument is not tenable. The cost of improving real property is made up of the following elements: raw materials of construction; labor in putting the material in place; management and other expenses; and capital. Value by the cost approach is based upon the reproduction cost of a building, new, minus any accrued depreciation, plus land value; such cost includes raw material, labor, management and other expenses, and the builder’s profit.
 
 Encyclopedia of BealEstate Appraising
 
 (Friedman ed, rev & enlarged ed, 1970), 66,80. The architect fee, together with the contractor’s overhead and profit, and the cost of labor are regularly included in a construction cost estimate.
 
 See
 
 Ring,
 
 The Valuation of Real Estate
 
 167-171 (2d ed, 1970). And
 
 see,
 
 below, pp 301 and 302, the quotation from
 
 Assessing and the Appraisal Process.
 
 Architect fees are a proper item of cost in this case.
 

 Again, plaintiff would deduct the construction costs paid out on account of the city-owned property, on the ground that such outlays do not add to the value of the property. (Plaintiff, in its arguments, stated that the sum involved was $12,000; this sum was an estimate by Mr. Jack Raiche, a former employee (Property Control Officer) of the plaintiff who did not appear in court. It is obvious in the detailed cost approach of Mr. Dilg
 
 (supra)
 
 that he considered only $2,800 for irrigation and $4,700 for landscaping for both bank-owned and city-owned property.) This was a cost of construction imposed upon the bank by the city as a condition precedent to obtaining the necessary permits for construction. There is no question but that
 
 *[297]
 
 the money thus expended resulted in a valuable amenity which adds value to the property as a whole. Furthermore, this is an amenity which is more closely related to the bank and its surroundings than in the case of a nearby park or coveted view to which an assessor gives consideration as a part of the value of an office building site as well as a residential site. An appraiser weighs the amenities in the light of current market standards. The characteristics and customs of competing neighborhood banks are properly considered in estimating the extent to which a design meets the needs or desires of those who comprise the probable market. It is interesting to note that the pictures of competing branch banks shown in Plaintiff’s Exhibit 7, pp 11-14, all illustrate substantial amounts of attractive landscaping. There is no doubt that the landscaping of the subject property added value thereto and that the visitor to the property would be unable to distinguish between the bank’s property and the city’s property, since the design has a pleasing homogeneity. The $7,500 which Mr. Dilg ascertained were spent by the contractor for purposes of irrigation and landscaping for both the plaintiff’s and the city’s respective ownerships are proper costs in this instance.
 

 Plaintiff’s claims of economic obsolescence because of inferior location and of functional obsolescence because of the triangular form of the bank building were disputed by the defendant and no allowance was made for these items by Mr. Dilg in his cost approach.
 

 "Economic obsolescence” is now being referred to as "environmental obsolescence” by some authorities.
 
 See
 
 American Institute of Real Estate Appraisers,
 
 The Appraisal of Real Estate
 
 (7th ed, rev 1978), at 251. Plaintiff asserted economic obsolescence, alleging that the new bank structure had been built in a poor neighborhood. However, Mr. Henry’s testimony and reliance upon data based on 1970 census reports of the neighborhood carried no conviction to the court that his premise was correct. Unrefuted
 
 *[298]
 
 testimony was given that the subject property has one of the highest traffic count locations in Eugene and that a major new branch bank was established farther out on 11th Avenue than the subject property. In view of the above and the outdated data upon which plaintiff relied, the court finds that the plaintiff has not sustained the burden of proof required by ORS 305.427. A reduction for economic obsolescence is denied.
 

 Functional obsolescence is the impairment of functional capacity or efficiency or the inability of a structure to perform adequately the function for which it is currently employed. It reflects the loss in value brought about by such factors as overcapacity, inadequacy and changes in the art that affect the property item itself or its relation with other items as in a larger property.
 
 Ore. Portland Cement Co. v. Dept. of Rev.,
 
 8 OTR 78, 93 (1979).
 

 Mr. Gayle Makin, Assistant Vice President, The Oregon Bank, testified on the question of functional obsolescence:
 

 "Q Mr. Makin, in your opinion would The Oregon Bank ever build such a branch again?
 

 "A Absolutely not.
 

 "Q Why not?
 

 "A We were under a $40 per square foot budget when we agreed to build this particular facility. Because of the type of facility, it ended up costing us substantially more than that, a value that we don’t feel we can ever recuperate. We find that the building is very inefficient. Internally, you have comers that you cannot use because of a triangular shape. It’s very difficult to lay out a bank lobby in the structure because of the configuration. We have found it to be a very unsatisfactory bank structure.” (Tr 16.)
 

 Mr. Henry’s total testimony in support of his view that there was functional obsolescence in the bank’s new building is found in the transcript, pp 51-52, as follows:
 

 
 *[299]
 
 "Q Okay, Mr. Henry, would you please now describe for the Court how you arrived at what you determined to be the functional obsolescence of this building?
 

 "A Yes. In reviewing various branches that built in certain areas, and I tried to obtain construction costs, but what I found out is that basically all of them were rectangular in nature versus the subject’s triangular type of structure. I think it’d be safe to forgo that a triangular type of building would cost more than a rectangular. The main problem is, is if there’s a loss in utility of that building due to the tight comers and due to the way the tellers’ rows had to be arranged versus what other branches had I took the cost, I compared it to our costs incurred. From the Marshall system, the county’s DR and A — or, excuse me, State of Oregon’s and figured the cost difference from what we incurred versus if we would have built something rectangular, the difference would have been approximately $37,150. [Sic.]
 

 "Q And that was also a deduction in your mind to the construction costs, is that correct?
 

 "A That’s correct.”
 

 Mr. Henry may have proved that it is less costly to build a rectangular building than to build a triangular building. The court regards this conclusion as reasonable (but would inquire: Why did the plaintiff, a free agent, choose this design? Possibly to accentuate the image which banks seek?). However, Messrs. Makin and Henry did not offer any proof that persuaded the court that the value of the building, as eventually constructed, resulted in an overall loss which could be properly denominated as "functional obsolescence.”
 

 The court does not reject the possibility of proof of functional obsolescence, once the bank has had a sufficient history of use and data are collected which clearly demonstrate the quantum of economic loss in efficiency of workers or of machinery. Mr. Henry’s determination of a diminution in value of $37,150 misses the mark, since it represents merely the difference in cost of building a rectangular structure as compared to a triangular structure, each encompassing an equal number of square feet.
 

 
 *[300]
 
 Some understanding of the problems of proof of economic obsolescence can be gained from
 
 Bend Millwork v. Dept. of Revenue,
 
 285 Or 577, 592 P2d 986 (1979);
 
 Publishers Paper Co. v. Dept. of Rev.,
 
 270 Or 737, 530 P2d 88 (1974);
 
 Reynolds Metals v. Dept. of Rev., 258
 
 Or 116, 477 P2d 888, 481 P2d 352 (1971);
 
 Georgia-Pacific v. Tax Com.,
 
 237 Or 143, 390 P2d 337 (1964);
 
 Ore. Portland Cement Co. v. Dept. of Rev., 8
 
 OTR 78 (1979); and
 
 Publishers Paper Co. v. Dept. of Rev., 5
 
 OTR 346 (1973).
 

 The court finds that plaintiff’s evidence does not compel its conclusion and it has failed to make a prima facie case as to any dollar amount to be deducted from the building costs on the basis of alleged functional obsolescence.
 
 Millar v. Semler,
 
 137 Or 610, 619, 2 P2d 233, 234, 3 P2d 987, 988 (1931).
 

 Based on statements he received from the bank, the contractor and the architect, Mr. Dilg added to the cost of construction an "estimate of interest on construction money” in the sum of $14,085. This was disputed as an improper deduction by the plaintiff which argued,
 
 inter alia,
 
 that the capital for building the structure was taken from the bank’s reserve funds which, under law, could not be used by the bank for producing interest and, consequently, under the cost approach, no interest was ever paid out. (No testimony was given as to whether the contractor’s fees included any sum for interest paid by the contractor.) Mr. Dilg’s reasons for including the sum are found in his testimony (Tr 108) as follows:
 

 "* * * Now the estimate of interest on construction money was established by investigating the type of interest that was being paid at that particular time by contractors in the borrowing or the letting of money and it was applied to the land that was being held during that time of construction and even prior to and the cost of the moneys as nearly and closely as I could determine the payments by the A.I.A. documents over the period of the time of construction very conservatively in regards to that elapsed time for that going rate of interest. * * *”
 

 
 *[301]
 
 As has been observed above, the cost approach is being used in this appraisal for lack of a better approach, but the ultimate aim is to obtain that figure which is most justifiable as being the "market value” on the assessment date of January 1,1977. The department’s OAB, 150-308.205-(A) provides the essential definition:
 

 "a. Market Value as a basis for true cash value shall be taken to mean the highest
 
 price in terms of money
 
 which a property will bring if exposed for sale in the open market, allowing a period of time typical for the particular type of property involved and under conditions where both parties to the transaction are under no undue compulsion to sell or buy and are able, willing and reasonably well-informed.”
 

 The parties used a cost approach to determine market value, but market value must include all those costs which are normally present in the construction of improvements on a given piece of property.
 

 It is commonplace to find an uninformed homeowner who disputes the county assessor’s property valuation by seeking to prove only the owner’s out-of-pocket expenses in the construction (producing invoices for all materials involved), only to find that the difference results from the fact that all or most of the necessary labor was contributed by the owner and his family, which the owner discounts completely. The element of interest in the present suit is placed in an analogous status by the plaintiff, but this is contrary to the usual concepts of cost.
 

 "Cost consists of all the direct labor and materials and indirect expenditures required to complete the construction of a structure. From the viewpoint of the builder or developer, cost includes all the components of expense he incurs in the manufacture of the building. He intends to recapture all these costs, including overhead and profit, if he places the property for sale. Likewise, a builder constructing a building for the owner of a site will charge a price which allows him to recoup his expenditures, including a reasonable sum for such items as overhead and profit. If cost is to represent value, it is
 
 *[302]
 
 necessary that
 
 all
 
 appropriate costs be included in the estimate. The goal of the assessor is not cost; it is value. Cost is merely the avenue to value in this approach.
 

 "Cost may be divided into two categories—direct and indirect. * * * Indirect costs include (but are not limited to) the following: architect and engineering, building permits, title and legal expense, insurance, real estate and other taxes during construction, construction loan fees and interest payments during construction, overhead, profit, advertising and sales expense. When using manuals or actual cost submissions, the assessor must learn to what extent all direct and indirect costs are reported.” International Association of Assessing Officers,
 
 Assessing and the Appraisal Process
 
 46 (5th ed 1974).
 

 Mr. Dilg’s amount of interest was not disputed; plaintiff rejected the principle that interest should be included when the bank allegedly paid none. In the search for market value, the principle must be followed. Therefore, the $14,085 determined by Mr. Dilg is found by the court to be a proper cost, to be included with other approved costs.
 

 Mr. Dilg erroneously included the sum of $8,400 for "teller counters (cages).” This was based upon an estimate by him. This item was given consideration in the Opinion and Order No. VL 78-264, on pages 4 and 5. At the departmental hearing, testimony was received that the "teller row” in the subject property involved a new concept "that utilizes movable furnishings that are replaced approximately every seven years.” Such furniture should be classified as personal property under the defendant’s rules.
 
 See
 
 DR A&A Supp (Oct 1975) 5-170.30, p 2 (found in PI Ex 7, Addenda). The taxpayer provided evidence at the departmental hearing that the actual cost was $4,040 but admitted that this sum had not been reported in the taxpayer’s annual personal property return for the 1977-1978 tax year. Thereupon, the Deputy Director of the Department of Revenue allowed a deduction of $4,360 against the real property value on account of overvaluation but concluded that, "There is no basis, at this time, to
 
 *[303]
 
 deduct this 'teller row’ in toto from the county’s report.” He, therefore, continued the balance as a part of the real property valuation. Mr. Dilg’s real property costs must be diminished by the sum of $8,400, representing the teller counters, and the plaintiff’s personal property tax return value for the subject year shall be increased by the sum of $4,040.
 

 The court finds that the value of the improvements upon the subject property as of January 1, 1977, was $212,518, rounded to $212,520. Pursuant to Tax Court Rule 27, the defendant shall prepare a form of decree, directing the Lane County Department of Assessment and Taxation to correct the assessment and tax rolls in conformance with the court’s opinion, and providing for the payment or refund of tax as may appear necessary. The defendant is entitled to costs.