IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

SUSBAUER ROAD LLC,                    )
                                      )
            Plaintiff,                )        TC-MD 230056N
                                      )
      v.                              )
                                      )
WASHINGTON COUNTY ASSESSOR,           )
                                      )
            Defendant.                )        **DECISION**

Plaintiff appealed the value of property identified as Account R991298 (subject property)

for the 2022-23 tax year. A trial was held on October 24, 2023, at the Oregon Tax Court.

Richard D. Senders, Oregon attorney, appeared on behalf of Plaintiff. The following witnesses

testified on behalf of Plaintiff: Thomas Clarey (Clarey), Plaintiff's manager and licensed realtor;

Chris Bradley (Bradley), Vice President of Business Development for Tandem Property; Ken

Sandblast (Sandblast), land use planning consultant; Pat Griffith (Griffith), real estate broker;

Steven Anderson (Anderson), real estate broker and registered property appraiser; and Mark R.

Skelte (Skelte), MAI, certified general appraiser. Jason Bush, Senior Assistant County Counsel,

appeared on behalf of Defendant. Andrew Volokitin (Volokitin), registered appraiser, testified

on behalf of Defendant. Plaintiff's Exhibits 1 to 29 and Defendant's Exhibits A to C were

received without objection. The parties filed written closing arguments on November 7, 2023.

I. STATEMENT OF FACTS

Clarey testified that the subject property is a 5.44-acre site improved with a 1,224-square

foot one-story, single-family home built in 1962; a 9,000-square foot storage building built in

2011 to 2012; an 17,800-square foot storage building built in 2012; a 41,250-square foot storage

building with a 22,750-square foot mezzanine built in 2014 to 2015; curbing and paving added in

2012; and a fire suppression pond.[1]  (*See* Ptf's Ex 1, Ex 18 at 35; Def's Ex A at 9, 41.)  Clarey testified that Plaintiff acquired the subject property for $385,000 in 2009, after it had been on the market for over two years.  He had started a car collection as of 2009 and was looking for an inexpensive piece of property between Portland and the coast that also had a house.

A.    *Subject Property Site*

The subject property is in the AF5 (Agriculture and Forest) zone.  (Ptf's Exs 10, 11.) Clarey testified that the subject property is near the city of Cornelius, but outside the urban growth boundary and urban reserve.  It's in the "rural reserve," so it's not anticipated to be brought into the city for at least 40 years.  (*See* Ptf's Ex 2.)  Based on its zoning, Clarey thought the subject property would be a good 30- to 40-year investment.  At the time of Plaintiff's purchase, the subject property was in farm deferral as part of a 2,000-acre farm.  The farm deferral was lost after Plaintiff built the three storage buildings.  The buildings "essentially occupy the remaining site area leaving no room for agricultural use."  (Ptf's Ex 18 at 37.)

Sandblast testified that the AF5 zone is sprinkled throughout the natural resource zones (farm and forest), recognizing a need for some rural residential parcels.  (*See* Ptf's Exs 10, 11.) The primary use is residential, so commercial and industrial uses are not generally allowed, with some exceptions for uses that may be allowed through a Type II or III procedure.  (*See* Ptf's Ex 11.)  For instance, a small home business may be allowed through a Type II procedure and a winery may be allowed through a Type III procedure.  (*See id.*)  Type III involves the most rigorous review, including a public hearing and comment.  Accessory structures are permitted and typical in the AF5 zone: homes often have buildings to store farm equipment, workshops,

---

[1] Skelte testified the that discrepancy in the subject property's size of 5.4 vs. 5.5 acres is due to an easement on the north boundary of the subject property.  With respect to the year built, some projects spanned two years.  For instance, Clarey testified that Plaintiff built the 9,000-square foot building in 2011 and 2012.

and other "pole barns" and "ag buildings" that are open with metal ceilings. The subject property's storage buildings are not typical for the zone but are permitted.

B.      *Subject Property Improvements*

Clarey testified that the subject property house is original except for kitchen cabinets that were updated 10 to 15 years ago. As of the assessment date, it was occupied by a caretaker. The storage buildings each have a concrete slab floor. The two smaller buildings are metal with sheetrock, insulation, heaters that hang from the ceiling, and three fans per 10,000 square feet. The larger building has posts every 20 to 30 feet to support the structure. Volokitin added that the buildings each have mechanized roll up doors, gas lines, good lighting, and sprinklers. (*See* Def's Ex A at 16-33.) The largest building has a bathroom and small shop. (*Id.* at 25-33.)

Clarey did not retain detailed cost information for the storage buildings but estimated that he spent around $2.3 million for all three buildings including the asphalt.[2] He compared the buildings to "erector sets": they came prefabricated and could be set up in 90 days. Climate control is minimal with insufficient ventilation to start or drive cars in the buildings. There is no elevator to the mezzanine. Clarey emphasized that the buildings are for *storage* of his collection, which includes many cars that haven't started in over 100 years. Holding costs for the buildings include running the heaters, cleaning the roofs, and doing fire checks. He knew the subject property was overbuilt by the time he finished the second storage building but built the third building anyway to support his hobby. Clarey has no expectation of recovering more than a fraction of what he spent. He estimated it would cost more than $200,000 to tear down the buildings and revert the subject property to pasture.

---

[2] It is unclear if Clarey's cost estimate included labor. He testified that he hired subcontractors for labor such as pouring concrete. Presumably Clarey acted as the general contractor.

C.    *Market for Rural Residential Property*

The subject property as improved is unique for the AF5 zone in Washington County: of 603 properties, only 34 had outbuildings exceeding 5,000 square feet, none of which were close to the size of the subject storage buildings.  (*See* Ptf's Ex 7 (largest outbuildings totaled 38,016 square feet).)  Ten properties had outbuildings exceeding 10,000 square feet, and they were all equestrian arena shelters or greenhouses.  (Ptf's Ex 8.)  Most properties also included a house. (*See id.*)  The highest value property per county records was a 5.78-acre lot with a 4,940-square foot home built in 1990 and a 14,548-square foot arena shelter, assigned a total improvement value of $1,222,820.  (*Id.* at 1.)  Since 2020, five properties with outbuildings over 5,000 square feet sold for prices ranging from $630,000 to $1,750,000.  (Ptf's Ex 9.)  The highest sale price was for a 3,737-square foot house built in 2006 with 8,184 square feet of farm buildings and stables built in 2007 that sold for $1,750,000 in August 2020.  (*Id.*)

Griffith testified that buyers in the AF5 zone typically want a few acres to have privacy, raise kids, and get a few animals and "toys."  There is no "market requirement" for outbuildings – many properties have none – but outbuildings such as a small barn and storage for an RV are common.  A 3,000-square foot pole barn adds about $90,000 in value, but beyond that size the cost to construct cannot be recovered.  If you build something too large, no one in market wants to pay for it: buyers can't afford it and don't need it.  Griffith testified that the subject property's storage buildings considerably exceed the market norm.  Before the buildings were added, he would have expected a young family to buy the subject property.  Now, it would be difficult to market due to the large buildings and blacktop; it has no land left for farming.  He would probably ask $1,240,000 with $450,000 allocated to the land, $190,000 allocated to the house, and $600,000 allocated to the storage buildings.

Anderson offered a price opinion of $1,050,000 for the subject property based on six sales from the area. (Ptf's Ex 14.) He did not find any similar properties with 90,000 square feet of outbuildings; the maximum size is typically 3,000 to 5,000 square feet. Anderson assigned a value of $300,000 to the storage buildings because that is the most the market would pay.[3] (*See id.*) He testified that a potential buyer of the subject property would have to pay cash because lenders typically impose a 30 percent limit on outbuildings for rural residential property. Anderson identified a sale within one mile of the subject property that supported his value conclusion: a "turnkey greenhouse/nursery business on 84+ acres [with] 2 legal dwellings," an "artist studio (1872 SF)," an "office (3072 SF)," a "pole barn (6912 sf)," a "shop (1440 sf), sheds, shipping yard * * * 42 heated houses (103,336 sf), [and] 33 unheated houses (85,536 sf)." (Ptf's Ex 16.) It was listed for $2,250,000. (*Id.*) Anderson testified that it sold for $1.9 million cash, notwithstanding the $2,425,000 price stated in the multiple listing service. (*See id.* at 2.)

D.      *Market for Alternative Uses and "Car Properties"*

Volokitin considered alternative uses that might be allowed in the AF5 zone, identifying five possibilities: car collection, marijuana production, winery, crop storage and processing, and farm equipment storage. (Def's Ex A at 38.) He noted winery and marijuana production uses were not legally permissible as of January 1, 2022, and would require land use approvals. (*Id.*) Griffith and Anderson each expressed skepticism about other agricultural uses of the subject property. Skelte testified that he could not find any examples of leased farm equipment or crop storage. He noted that wineries typically need less than 20,000 square feet of storage and indoor marijuana production is limited to 10,000 square feet. (*See* Ptf's Ex 29.)

---

[3] Anderson also used farm building cost factors from the Oregon Department of Revenue's 2009 Cost Factor book to determine values for the subject property's storage buildings and fire suppression pond but testified that he did not place any weight on that analysis because the market wouldn't. (*See* Ptf's Ex 15.)

Volokitin found that similar "car properties" existed in Oregon, albeit in industrial zones: the Brothers Car Collection and Museum in Salem, and Papa's Toys in Cornelius. (Def's Ex A at 44.) The Brothers property was previously a semiconductor manufacturing facility and Papa's Toys was previously housed in larger warehouses within a commercial and industrial area. (*Id.*) Volokitin reviewed the website CarProperty.com, finding national sales in "a wide variety of locations, including rural, industrial, and commercial zoned parcels." (*Id.* at 44.[4]) Volokitin concluded that the subject property would likely be marketed regionally through specialty websites to buyers with a collection to preserve. (*Id.*) "There is a market, however limited, for properties with specialized storage for vehicle collections." (*Id.* at 45.)

Clarey testified that, in his opinion, other car collectors would not be interested in the subject property based on its location in rural Oregon, explaining that car collectors want to be near their cars. However, he conceded he does not know *every* other car collector and did not know about Papa's Toys for four to five years. Griffith testified that he has seen buyers looking for a rural property to store five to ten cars but has never seen anyone in the market with the same need as Plaintiff. Anderson testified that car collectors want industrial zone property.

E.     *Appraisal Reports, Tax Roll Values, Requested Values*

1.     *Plaintiff's appraisal*

Skelte considered the highest and best use (HBU) of the subject property both as vacant and as improved. (*See* Ptf's Ex 18 at 39-40.) As improved, he observed that "[t]he existing use encumbers the entire site." (*Id*. at 40.) With respect to financial feasibility, Skelte wrote:

/ / /

---

[4] Excerpts from the website show warehouses filled with old cars and buggies and reference a 2019 sale in New Jersey with "300 garage spaces"; a 2020 sale in New Jersey of a 23,000-square foot property with 100 spaces; a 2021 sale in Georgia of a 40,000-square foot property with 166 garage spaces; and a 2021 sale in Florida consisting of 18 outbuildings, including three air-conditioned warehouses. (Def's Ex B at 27-30.)

"The storage buildings represent a substantial over improvement and the cost to construct significantly exceeds the market value. As such these improvements represent a Functional Obsolescence in the form of super adequacy. To cure a super adequacy is the cost to remove the existing over improvement and replace it with a market acceptable alternative. In the case of the subject the cost to remove the excess structure would exceed any value improvement."

(*Id.* at 40.[5]) Based on that analysis, he concluded that the subject property's "existing uses * * * reflect the maximum productivity" and the HBU "is as improved." (*Id.*) Skelte identified "the most probable buyer" as "a family wanting a rural residence and hobby farm with outbuildings for storage," though he testified it would be hard to find such a buyer. (*See id.* at 21.)

Skelte considered each of the three approaches to value but relied solely on the cost approach due to the lack of comparable sales and leases in the AF5 zone. (Ptf's Ex 18 at 41.[6]) He determined a land value of $470,000 based on five land sales from 2020 and 2021, adjusted for differences. (*Id.* at 48-51.) Skelte used Marshall Valuation Service (MVS) to calculate the replacement cost new (RCN) of the improvements, selecting "storage warehouse" cost factors for the storage buildings. (*Id.* at 52-55, 67.[7]) From his RCN of $4,699,921, Skelte subtracted $1,149,750 in physical depreciation for all structures based on the age-life method. (*Id.* at 52-55.[8]) He further subtracted $2,758,210 in functional depreciation for the storage buildings. (*Id.*)

Skelte's depreciation for functional obsolescence reflected his opinion that the subject storage buildings were superadequate both in size and quality of construction. (*See* Ptf's Ex 18 at 52-53.) He determined the market would only pay for the 9,000-square foot building, but not

---

[5] Skelte did not identify the cost of removal or otherwise quantify his conclusion.

[6] Skelte testified that the size of the subject storage buildings is common in commercial and industrial zones, but not the AF5 zone.

[7] Skelte's RCN was based on per square foot base costs of $127 for the house, $43.50 for the garage, $50.50 for the three storage buildings, $28.20 for the mezzanine, and $2.63 for the sprinklers, plus $150,000 for site improvements and $55,000 for soft costs. (*Id.*)

[8] Skelte used a 50-year life for the house and garage, and a 30-year life for the storage buildings. (*Id.*)

for the full cost to construct it because its quality exceeded market norms. (*See id.*) Skelte compared the cost to construct the subject storage buildings ($52.58 per square foot) with the cost to construct a pole barn ($31.00 per square foot), a 41 percent difference. (*Id.* at 43.) He depreciated the 9,000-square foot building by 40 percent for that excess cost. (*Id.*) Skelte depreciated the other two buildings by 94 percent due to their quality of construction and excessive size. He based that deduction on the lack of similar properties in the AF5 zone and conversations with realtors who indicated "a significant concession would be needed in relation to the cost of the storage structures" to market the subject property. (*Id.* at 53.) They cited the lack of usable land and the cost of maintenance, insurance, and utilities. (*Id.*[9])

Skelte cross-checked his functional obsolescence conclusion by reference to an October 2021 sale of a 33.71-acre property with 83,883 square feet of structures including a 1,836-square foot manufactured home, a 44,925-square foot "steel frame indoor riding arena[,]" and various other supporting structures. (Ptf's Ex 18 at 54.) Skelte testified that the property was marketed for two years, receiving multiple offers that did not come through due to financing, and finally sold for $2,050,000. He estimated the RCN of the improvements to be $3,553,069 and compared that to the portion of the sale price allocated to the improvements ($1,060,000), finding total depreciation of 70.2 percent. (*Id.*) Skelte wrote that the sale "shows how the market reacts to over improvements on re-sale" and noted that sale was superior because it had 30 acres of usable land. (*Id.*) He made another cross-check by considering sales of single-family homes on five acres, finding a value of $525,000 as of January 1, 2022. (*See id.* at 56-57.)

Skelte concluded an indicated value of $1,260,000 under the cost approach, which was his ultimate value conclusion for the subject property. (Ptf's Ex 18 at 3, 55.)

---

[9] No specific cost was provided.

2. *Defendant's appraisal*

Volokitin also considered the subject property's HBU both as vacant and as improved, concluding its HBU as improved was its current use, "a single-family residence with existing accessory structures." (Def's Ex A at 43.) Elsewhere, he described the subject property as "specially constructed to store a private vehicle collection." (*Id.* at 44.) Volokitin considered all three approaches to value but did not use the sales comparison or income approaches due to a lack of market data, relying solely on the cost approach. (*Id.* at 46.)

For his cost approach, Volokitin determined a land value of $535,000 based on three land sales from 2020 and 2021, adjusted for differences in time, location, and site developments. (Def's Ex A at 47.) Volokitin testified that he used the MVS cost factors for a "storage garage" because the storage buildings had heating and roll-up doors, whereas a "storage warehouse" is only designed to stay above freezing; he calculated a total RCN of $5,528,494 for the storage buildings. (*See* Def's Ex C at 2.[10]) Volokitin deducted total physical depreciation of $1,362,524 for the storage buildings using the age-life method and a 35-year life. (*See id.*) For the subject house, he calculated an RCN of $183,245 and deducted physical depreciation of $68,717. (Def's Ex A at 53.) Volokitin added $99,350 for paving and curbing, concluding a value of $4,915,000 under the cost approach. (Def's Ex C at 3.) As a check, he used the sales comparison approach for the subject house and land, finding a value of $650,000. (Def's Ex A at 49, Ex C at 4.)

Volokitin explained that he did not subtract any depreciation for functional obsolescence because "the market standard for the subject property is as personal vehicle storage and [its] being used at capacity." (Def's Ex A at 44.) In support, he cited to the rule on "special purpose

---

[10] Volokitin's outbuildings RCN was based on per square foot costs of $67.03 for the 9,000-square foot building, $63.28 for the 17,800-square foot building, and $92.08 for the 41,250-square foot building. (Ex C at 2.)

property" which is "specially designed, equipped, and used for a specific operation or use." (*Id.*, *citing* OAR 150-308-0240(3)(a).) Skelte disagreed that the subject property is special purpose because it lacks unique features inherent to the design, such as a bowling alley or car dealership. He found the subject storage buildings to be general purpose. Skelte also disagreed that vehicle storage was the market standard, finding that Volokitin determined a value in use.

  3.  *Tax roll and requested values*

  The subject property's 2022-23 tax roll real market value was $6,648,510 and the board of property tax appeals sustained that value. (Compl at 2.) Its 2022-23 maximum assessed value and assessed value were each $2,064,950. (*Id.*) Plaintiff requests a real market value in the range of $1,000,000 to $1,260,000. (*See also id.* at 1 (requesting real market value of $1,099,240).) Defendant requests a real market value of $4,915,000. (*See* Def's Ex C.)

## II. ANALYSIS

  The issue presented is the subject property's 2022-23 real market value. As the party seeking relief, Plaintiff bears the burden of proof by a preponderance of the evidence, which means "the greater weight of evidence, the more convincing evidence." ORS 305.427; *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971).[11] "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412. "Real market value" is "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1). The assessment date for the 2022-23 tax year was January 1, 2022. ORS 308.007; ORS 308.210.

---

[11] The court's references to the Oregon Revised Statutes (ORS) are to 2021.

Real market value "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). The Department of Revenue requires that three approaches to value—the cost approach, the sales comparison approach, and the income approach—be considered but each may not be applicable in every case. Oregon Administrative Rule (OAR) 150-308-0240(2)(a); *see also Dept. of Rev. v. River's Edge Investments*, 359 Or 822, 827, 377 P3d 540 (2016). If the property has no immediate market value, its real market value is the amount of money that would justly compensate the owner for loss of the property." ORS 308.205(2)(c).[12] For properties with no immediate market value under ORS 308.205(2)(c), the cost and income approaches are used to develop the market value. OAR 150-308-0240(2)(f).

Turning to the subject property, its uniqueness within the AF5 zone in Washington County is the central problem in determining its real market value. Ample evidence demonstrates that no other properties in the zone have outbuildings approaching the size of the subject property storage buildings. For that reason, the parties disputed whether the subject property was special purpose, superadequate, or had an "immediate market value" as of the assessment date. Ultimately, the court need not decide whether the subject property had an "immediate market value" under ORS 308.205(2)(c) because both parties relied on the cost approach to determine real market value.[13] The important issue for determination is the subject property's HBU as improved because that impacts whether the subject property suffered from a superadequacy. *See* Appraisal Institute, *The Appraisal of Real Estate* 528 (15th ed 2020)

---

[12] Just compensation refers to the real market value of property at its HBU. OAR 150-308-0240(1)(f).

[13] *See also Ellison v. Clackamas County Assessor*, 22 OTR 201, 203-04 (2015) (raising and dismissing whether the just compensation standard in ORS 308.205(2)(c) is consistent with the constitutional definition of real market value because both parties in that case used the cost approach rather than the sales comparison approach).

(superadequacy is "identified by comparing the existing improvements with the ideal improvement and then treated by making a deduction from the cost of the improvements").[14]

A.      *Highest and Best Use*

HBU "means the reasonably probable use of vacant land or an improved property that is legally permissible, physically possible, financially feasible, and maximally productive, which results in the highest real market value."  OAR 150-308-0240(1)(e).  An HBU analysis "is an economic study of market forces focused on the subject property."  *STC Submarine, Inc. v. Dept. of Rev.*, 13 OTR 14, 18 (1994) (quoting Appraisal Institute, *The Appraisal of Real Estate* 276 (10th ed 1992).  "At its core, highest and best use analysis is an examination of alternative uses of a property, each use having its own characteristics related to the value-influencing factors of utility, demand, effective purchasing power, and scarcity."  *The Appraisal of Real Estate* at 318.

When analyzing a property's HBU as improved, the appraiser must consider three possibilities: 1) retain the improvements; 2) modify the improvements; or 3) demolish the improvements.  *The Appraisal of Real Estate* at 307-308.  Any potential change to existing improvements must be financially feasible: that is, "the change must add at least as much value to the property as it costs."  *Id.* at 314.  For "properties with improvements that differ significantly from the ideal improvement, an appraiser should determine whether the property can continue to operate at its current use and alternatively whether applicable codes, ordinances, or private restrictions allow modification of the improvements that would bring them into conformity."  *Id.* at 330.

/ / /

---

[14] HBU is "the first issue" and "the market value of the property at that use" is "the second issue."  *Freedom Federal Sav. and Loan Ass'n v. Dept. of Rev.*, 310 Or 723, 727, 801 P2d 809 (1990).

Applying those principles to the subject property, neither appraiser concluded that the subject improvements should be demolished. That opinion appears supported because the value of the subject house and land alone is in the range of $525,000 to $650,000, whereas Plaintiff concluded that the subject property including the three storage buildings has a value of at least $1,000,000. Volokitin posed alternative uses for the subject property – such as for crop storage, a winery, or marijuana production – but he did not identify costs required to modify the subject property for those uses. Thus, the court accepts the appraisers' conclusion that the subject property improvements should be retained.

Both appraisers concluded that the subject property as currently improved represented its HBU, though the precise nature of the current use was muddled. Skelte concluded that the subject property's HBU was as a single-family residence and hobby farm in accordance with typical properties in the AF5 zone. The problem with that conclusion is that the use may no longer be physically possible or financially feasible. Skelte wrote that the storage buildings and extensive paving encumber the entire site. Both Griffith and Anderson noted that the subject has no land left for farming. A buyer seeking a single-family residence and hobby farm would not pay $1,000,000 or more for the subject (which lacks any land to farm) when other properties are available for prices ranging from $525,000 to $650,000.[15] The court is not persuaded that the HBU as improved is for a single-family residence and hobby farm.

Volokitin also characterized the subject property's HBU as a single-family residence with existing accessory structures, but elsewhere characterized it as a special use for a private vehicle collection. Notwithstanding his reference to a special use, he demonstrated that a market exists

[15] The properties Plaintiff identified worth more than $1 million are clearly not comparable to the subject property: they included newer homes three and four times larger than the subject house with equestrian amenities.

"car properties," noting two other such properties in Oregon and several sales in other states since 2019. Plaintiff's witnesses raised questions about whether the subject property would appeal to other car collectors based on its location in rural Oregon, its location in a residential zone,[16] and its lack of certain features such as ventilation for car exhaust and an elevator to the mezzanine. However, they did not present evidence to rebut the conclusion that *some* market exists for car properties.[17] The court finds Volokitin's description of the subject property's HBU as vehicle storage to be more plausible and persuasive.

B.      *Subject Property Real Market Value – Cost Approach*

Having determined the subject property's HBU, the court turns to its real market value at that use, as indicated under the cost approach. "In the cost approach, the value of a property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation * * * in the structure from all causes." *Magno v. Dept. of Rev.*, 19 OTR 51, 55 (2006) (*quoting The Appraisal of Real Estate* 12th ed). Both appraisers developed RCN calculations for the subject improvements, but they disagreed on the relevant base costs: Skelte used costs for a storage warehouse whereas Volokitin used costs for a storage garage. The evidence presented is insufficient for the court to determine which MVS base cost is appropriate for the subject storage buildings. (*Compare* Ptf's Ex 18 at 66 with Def's Ex A at 55 (both storage warehouses and storage garages have steel exteriors, "small" offices, "space heaters," and "adequate" or "low-level lighting").) Considering the two RCN calculations, the court finds

---

[16] Neither party suggests that the subject storage buildings are impermissible in the AF5 zone.

[17] It is unclear why Skelte did not explore the possibility of a national market for car properties and limited his search to Oregon. *See Ellison*, 22 OTR at 206 (finding defendant's appraiser erred when he failed to inquire beyond the local market despite evidence that "horse properties * * * are bought and sold in a national market").

Skelte gave a more detailed and persuasive explanation. Volokitin used different base costs for each of the three storage buildings without explanation and did not separately break out his cost for the mezzanine.[18] The court accepts Skelte's total RCN calculation of $4,699,921.

The next step in the cost approach is to subtract depreciation. *See Magno*, 19 OTR at 55. There are several forms of depreciation: physical, functional, and external. *See The Appraisal of Real Estate*, at 561, 575. Physical depreciation reflects wear and tear due to aging. *Id.* Both appraisers used the age-life method, though Skelte used a 30-year life for the storage buildings whereas Volokitin used a 35-year life. Once again, the court finds insufficient evidence to determine which figure is correct. To be consistent with its adoption of Skelte's RCN, the court also accepts his calculation of physical depreciation of $1,149,750.[19]

The appraisers disagreed whether the subject property suffered from any functional obsolescence. Skelte subtracted $2,758,210 on the theory that the subject storage buildings are superadequate both in quality and size compared to the typical property in the AF5 zone. Volokitin made no subtraction because the storage buildings are fully occupied serving the purpose for which they were constructed (vehicle storage).

Functional obsolescence "is caused by a flaw in the structure, materials, or design of the improvement when compared with the highest and best use and most cost-effective functional design requirements at the time of appraisal." *See Magno*, 19 OTR at 59-60 n11 (*quoting The Appraisal of Real Estate*); *see also Les Schwab Tire Centers of Oregon, Inc. v. Crook County Assessor*, 14 OTR 588 (1999) (determining functional obsolescence by reference to the ideal

---

[18] Volokitin's higher base rate of $92.08 for the largest building may have been a blended rate that included the cost of the mezzanine. (*See* Def's Ex A at 53, Ex C at 2.) But if that is the case, it is unclear why he multiplied the base rate by the entire building size even though the mezzanine is closer to half of the building size.

[19] Volokitin's calculation of physical depreciation ($1,362,524) is greater than Skelte's.

replacement property). Superadequacy is a form of functional obsolescence that occurs when a component exceeds "market norms or the requirements needed to operate cost-effectively." *Hewlett-Packard*, 357 Or at 612-13 (citing OAR). Excess space may be an example of a superadequacy. *See id.* (800,000 square feet out of 2 million was superadequate because potential buyer would need only 1.2 million); *see also Magno*, 19 OTR at 59-60 (home larger than others in neighborhood was superadequate). A superadequacy based on excess space often results in higher operating costs, such as to heat the space. *See Magno*, 19 OTR at 59-60 n11. This court has accepted functional obsolescence calculations based on capitalizing the additional operating costs over the life of the property. *See Reynolds Metals Co. v. Dept. of Rev.*, 299 Or 592, 603, 705 P2d 712 (1985) and *Hewlett-Packard*, 357 Or at 613 (each approving of method).

The court finds Skelte's calculation of functional obsolescence inconsistent with the court's HBU conclusion. Skelte's calculation – including 94 percent depreciation of the two larger storage buildings – is based on his conclusion that the subject property's HBU is as a single-family residence with a hobby farm, a conclusion rejected by the court. *See, e.g., Hewlett-Packard v. Benton County Assessor*, 357 Or 598, 616-17, 356 P3d 70 (2015) (rejecting department's calculation of loss associated with superadequacy of extra space because it was based on a multi-tenant use whereas the subject property's HBU was as a single-tenant property). Even if the court were to accept Skelte's conclusion that the storage buildings are too large compared to the ideal improvement, his calculation of functional obsolescence is general and imprecise.[20] He did not attempt to quantify the additional costs associated with the excess space, but rather gave a percentage-based estimate reflecting a premise that the two larger storage

_____

[20] Skelte supported his estimate by reference to the sale of a rural property with an equestrian arena. That property was not comparable to the subject property, and Skelte did not account for the possibility that depreciation reflected by the sale price compared to the RCN was due to external rather than functional obsolescence.

warehouses were nearly worthless.

Conversely, the court is not persuaded by Volokitin's conclusion that the subject property suffers from *no* functional obsolescence because he failed to compare the storage buildings to similar properties in the market. Clarey testified that the subject property suffers deficiencies compared to other properties, including inadequate ventilation for car exhaust and the lack of an elevator to the mezzanine. The Oregon Supreme Court has previously recognized that functional obsolescence may result from a deficiency in the subject property compared to the ideal property. *See Hewlett-Packard*, 357 Or at 612 (noting that functional obsolescence may result from a missing component). Unfortunately, the court received no evidence to quantify any depreciation resulting from such deficiencies, so the court is unable to determine their impact on the subject property's value.

Ultimately, Plaintiff bears the burden of proving that functional obsolescence exists and of providing a persuasive measure of it. *See The Oregon Bank v. Dept. of Rev.*, 8 OTR 291 (1980) (recognizing a "possibility" that property suffered functional obsolescence due to an inefficient shape but finding insufficient data of economic loss because the property was new); *Lebow v. Dept. of Rev.*, 10 OTR 53, 63 (1985) (holding deduction for functional obsolescence must be "clearly supported by specific measurable inutility" rather than "general" conclusions); *Stafford Hills Properties, LLC v. Dept. of Rev.*, TC 5250, 2017 WL 6326996 (Amended Op 2017) (rejecting taxpayer's 40 percent discount for superadequacy based on the size of a gym and wellness center where property was unique, specific, and new). Having found that Plaintiff failed to meet its burden of proving functional obsolescence, the court finds an indicated value of $3,550,000 for the subject property under the cost approach.[21]

---

[21] That is Skelte's RCN of $4,699,921 less his physical depreciation of $1,149,750, rounded.

### III. CONCLUSION

Upon careful consideration, the court concludes that the subject property's 2022-23 real market value was $3,550,000. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2022-23 real market value of property identified as Account R991298 was $3,550,000.

Dated this _____ day of May 2024.

_____

***If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.***

***Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.***

***This document was signed by Presiding Magistrate Allison R. Boomer and entered on May 9, 2024.***